ARMED SERVICES BOARD OF CONTRACT APPEALS

| | |
|---|---|
| Appeal of - | ) |
| | ) |
| Voxtel, Inc. | ) ASBCA No. 60129 |
| | ) |
| Under Contract Nos. FA8750-05-C-0041 *et al.* | ) |

APPEARANCES FOR THE APPELLANT:          Eric Nackarud, Esq.
                                                                        Counsel

                                                                    Marcus W. Eyth, Esq.
                                                                        Davis Wright Tremaine LLP
                                                                        Portland, OR

                                                                    Kate H. Kennedy, Esq.
                                                                        Davis Wright Tremaine LLP
                                                                        Seattle, WA

APPEARANCE FOR THE GOVERNMENT:      Samuel W. Morris, Esq.
                                                                        DCMA Chief Trial Attorney
                                                                        Defense Contract Management Agency
                                                                        Chantilly, VA

OPINION BY ADMINISTRATIVE JUDGE CATES-HARMAN

Appellant Voxtel, Inc. (Voxtel) appeals from a final decision of the Defense Contract Management Agency (DCMA or government) administrative contracting officer (ACO) unilaterally establishing final overhead rates. In that decision, the ACO found that Voxtel included unallowable costs related to independent research and development (IR&D), rent, executive compensation, and depreciation in its indirect cost rate proposals for fiscal years (FY) 2007-2009. We have jurisdiction pursuant to the Contract Disputes Act (CDA), 41 U.S.C. §§ 7101-7109. We sustain in part and deny in part the appeal.

FINDINGS OF FACT

*Background*

1. Voxtel is a small business that develops and manufactures advanced 3D imaging technologies (compl. ¶ 3). Voxtel's primary customer since its inception in 1999 has been the U.S. government. For the years in question (FY 2007-2009), its work was almost exclusively federal contracts, including Small Business Innovative

Research (SBIR) contracts. (Tr. 2/18-19) Voxtel is organized as a subchapter S corporation, and its sole owner is its president and chief executive officer, George Williams (tr. 2/12).

2. For purposes of this appeal, the relevant contracts include one contract awarded to Voxtel in 2005 by the United States Air Force Research Laboratory (No. FA8750-05-C-0041), another awarded in 2008 by the Office of Naval Research (No. N00014-08-C-0101), and a small business and innovation research (SBIR) contract with the Naval Surface Warfare Center, issued in 2006 (No. N00178-06-C3024) (R4, tabs 1-2, 5).

### *Contract Requirements*

3. Each of the contracts incorporated by reference Federal Acquisition Regulation (FAR) 52.216-7, ALLOWABLE COST AND PAYMENT (DEC 2002),[1] which imposes obligations upon both the government and contractors (R4, tabs 1 at 16, 2 at 42, 5 at 83).[2] This clause requires the government to pay the contractor as work progresses in amounts determined to be allowable by the contracting officer and in accordance with the version of FAR subpart 31.2 in effect on the date of the contract. *See* FAR 52.216-7(a)(1). This includes "[p]roperly allocable and allowable indirect costs, as shown in the records maintained by the Contractor for purposes of obtaining reimbursement under Government contracts . . . ." FAR 52.216-7(b)(1)(ii)(F).

4. FAR 52.216-7 also requires contractors to submit to the Defense Contract Audit Agency (DCAA) an adequate final indirect cost rate proposal (ICP) based upon the contractor's actual cost experience for that particular fiscal year. Those ICPs are due within six months of the expiration of each fiscal year. *See* FAR 52.216-7(d)(2)(i)-(ii).

5. Except for the SBIR contract, the relevant contracts incorporate by reference DFARS 252.215-7002, COST ESTIMATING SYSTEM REQUIREMENTS, which generally requires contractors to have an acceptable cost estimating system and disclose it to the government (R4, tab 1 at 18, 5 at 87).

---

[1] One of the contracts renumbers this clause as 52.216-07 (R4, tab 1 at 16).

[2] The parties numbered pages in their Rule 4 submissions with a prefix of letters and/or leading zeros. We have dropped the prefix and leading zeros and just cite the numeric page number.

*Voxtel's FY 2007-2009 ICPs*

6. Voxtel failed to submit its ICPs for FY 2007-2009 within the required time frame set forth in FAR 52.216-7(d)(2)(i)-(ii). DCAA informed Voxtel in nine separate letters between 2008 and 2013 that its ICPs were overdue (R4, tab 14). It was revealed much later that Voxtel did submit its 2007 ICP to DCAA on August 31, 2011 (ex. 134 at 2).

7. In a memorandum dated December 16, 2014, DCAA advised DCMA that Voxtel had failed to provide its ICPs for 2007-2009, and that DCAA would therefore be unable to provide an audit opinion on proposed rates and costs. Instead, DCAA recommended that DCMA "unilaterally determine contract costs using a decrement factor [of] up to 16.2 percent applied to contract costs (direct and indirect)" for the subject years. (R4, tab 14 at 117) This decrement was to be applied to both active and already completed contracts, as well as for fiscal years in the future when the active contracts were completed *(id.)*.

8. Meanwhile, at some point in 2014, Voxtel informed DCMA and DCAA that its 2007-2009 ICPs would be submitted in January 2015; Voxtel did in fact submit the ICPs on January 21, 2015 (R4, tabs 15-18; tr. 2/56-57).

9. Neither DCAA nor DCMA advised Voxtel that its ICPs would not be audited (tr. 2/58, 61). There is also no indication in the record that Voxtel knew that when the ICPs were submitted that DCAA had already recommended the 16.2% decrement.

10. After Voxtel submitted the 2007-2009 ICPs at DCMA's request, DCAA auditor Nicole Hilliard performed both an "adequacy" and a "nomenclature" review (tr. 1/30-32).

11. An "adequacy review" is a checklist or set of steps that DCAA uses to verify that the contractor included all the required schedules in its ICP (tr. 1/31, 2/136). It is described in part on the standard DCAA form used for adequacy reviews in the following manner:

> Adequacy reviews of contractor [ICPs] include verification for completeness and accuracy. The reviewer should verify the [ICP] includes the required schedules . . . . The reviewer should also perform a general review of the submission to verify math calculations in the schedules and perform a cross-check of amounts that are common to two or more of the schedules.

3

(Ex. 113 at 252; *see also* tr. 1/31)

12. A "nomenclature review involves "visually reviewing the accounts and amounts claimed in direct and indirect cost pools to try to identify any unallowable costs" (tr. 1/31). The DCAA Contract Audit Manual (January 2015) describes a nomenclature review in the following manner:

> (1) Nomenclature Review. Using a copy of the contractor's post-closing trial balance, which has been reconciled in accordance with the guidance in [§] 6-610, the auditor should select for thorough analysis those accounts which are new and/or significant in amount, vary from developed trends, or which on the basis of nomenclature review or past experience appear to be sensitive in nature and likely to contain questionable costs. *However, categories of indirect expense should not be accepted or rejected solely on the basis of a nomenclature review. The actual content of accounts being evaluated must be established through testing of transactions.*

(DCAA Contract Audit Manual § 6-608.2(c)(1) (2015)) (emphasis added)

13. On cross-examination, Ms. Hilliard conceded that even though she conducted only adequacy and nomenclature reviews, Voxtel's ICPs for 2007-2009 were adequate for audit (tr. 1/63). DCMA ACO Laura Musgrave, who authored the final decision that is the subject of this appeal, testified that she and Ms. Wada decided to "go ahead and set rates" rather than request a full audit (tr. 1/121). In ACO Musgraves' view, ordering an audit did not make good business sense given the delay it would have caused on the processing of already significantly delinquent ICPs (tr. 1/120). Another factor influencing the decision to forego an audit was that DCMA was "in transition with ACOs at the time;" i.e., ACO Musgrave was in the process of taking on the workload of the prior ACO, who was deploying (tr. 1/121).

14. With respect to the procedures to be followed in the case of delinquent ICPs, the DCAA Audit Manual provides as follows:

> a. The contracting officer is responsible for obtaining an adequate final indirect rate proposal from the contractor within the six-month period after the end of its fiscal year. Audit teams should assist the contracting officer by:
>
> . . . .

(4) Supporting the contracting officer in calculating a unilateral contract cost decrement based on history, when the contracting officer cannot obtain a proposal.

b. Headquarters Policy is responsible for coordinating directly with DCMA, and other administrative Agencies, to help identify significantly delinquent contractors that require administrative action. Administrative actions are at the discretion of the contracting officer, and may include further coordination with the contractor in cooperation with the audit team, and applying a unilateral contract cost decrement.

. . . .

d. When a proposal is significantly delinquent, audit teams should periodically coordinate with the contracting officer to determine its status and offer necessary assistance. If, through proper coordination, the FAO [field audit office] determines that it is unlikely that an auditable proposal is forthcoming, the FAO may close the assignment . . . .

(DCAA Contract Audit Manual § 6-707.2 (2015))

*Summary of Relevant Communications Between the Parties*

15. As a result of Ms. Hilliard's adequacy and nomenclature reviews, she and ACO Musgrave communicated with Voxtel representatives on a number of occasions between February and May 2015. The communications were primarily with Voxtel's contracts administrator, Debra Ozuna, although Voxtel's president, Mr. Williams, participated in one conference call. To summarize, those communications included the following:

-Email exchanges on February 19, 2015 and March 8, 2015 between Ms. Hilliard and Ms. Ozuna concerning information from Voxtel about certain entries DCAA was questioning;

-A May 1, 2015 email request from ACO Musgrave to Voxtel to engage in a conference call, along with the resulting conference call, which took place on

May 8, 2015 and was memorialized in an undated document authored by ACO Musgrave;[3]

-Email exchanges that took place on May 14-15, 2015 between ACO Musgrave and Ms. Ozuna concerning 1) a proposed draft indirect cost rate/allocation agreement ACO Musgrave prepared; 2) Voxtel's rejection thereof; and 3) Voxtel's provision of additional information/documentation responding to DCMA's concerns; and

-A final email exchange on May 15, 2015 between ACO Musgrave and Ms. Ozuna wherein ACO Musgrave sought and Ms. Ozuna provided confirmation of Voxtel's position on various questions previously raised by DCMA.

(R4, tabs 21 at 249-51, 24 at 409-10, 25, 26 at 432-33, 438-39, 49)

16. The testimony of Ms. Hilliard and ACO Musgrave indicates that DCAA and DCMA generally did not believe that the information Voxtel provided in the above-described communications sufficiently answered the government's questions (tr. 1/34-37, 132-33; *see also* R4, tab 21 at 248-49). They considered the information to be vague, conclusory, incomplete, and contradictory. This was the environment under which ACO Musgrave prepared and issued her final decision in July 2015.

17. After that date, however, Voxtel began providing additional, more focused information to DCMA in an effort to support the costs ACO Musgrave disallowed. Voxtel continued to submit additional information supporting its costs up to the date of the hearing, which resulted in an evolution of DCMA's position on several issues and the elimination of one issue altogether.[4]

18. The following findings address in turn each of the three remaining allowability issues in this appeal – cost of goods sold, rental expenses, and executive compensation (referred to by the parties as "unpaid owner's salary").

---

[3] The Rule 4 file contains a document which both parties appear to agree are notes prepared by Ms. Musgrave summarizing the discussions that took place during that conference call; accordingly, we accept it as such *(*R4, tab 49; *see* app. br., Appellant's Proposed Finding of Fact [APFF] ¶ 86 (referencing said document as being Ms. Musgrave's notes of the conversation); gov't reply br., ¶ 30 (no objection to APFF ¶ 86)).

[4] During the hearing, the parties resolved all of their differences with respect to the depreciation costs (tr. 2/85; *see* gov't br. at 32-33; app. br. at 1).

*Cost of Goods Sold*

*Background*

19. Voxtel uses an accounting package known as QuickBooks, software that is frequently used by small businesses. QuickBooks has a category of costs known as Cost of Goods Sold (COGS). During the time period in question Voxtel's practice was to use the COGS account to track all costs incurred to purchase materials, whether direct or indirect. Thus, Voxtel used it to track the costs of materials purchased directly for a contract, "indirect tools" (indirect costs incurred for items of general use), and indirect costs associated with independent research and development (IR&D). (Tr. 2/31-32)

20. With respect to IR&D costs, Mr. Williams testified that at the conclusion of a contract, Voxtel engineers may believe that the technology they were working on warrants further investigation, even though contract funding has run out. In those circumstances, Voxtel performs this further IR&D at its own expense, tracking the costs by contract and reporting them annually as required by the SBIR program. (Tr. 2/19-20)

21. Mr. Williams then described a specific instance where Voxtel was working on a 3D imager to locate underwater mines, but government funding ran out. Voxtel nevertheless continued to develop the technology at its own expense. (Tr. 2/23-25) Mr. Williams referenced an email dated December 2, 2015 which he stated was related to this specific instance of IR&D, in which Navy employee Paul Schlegel wrote the following:

> [M]y recollection of the issue was Voxtel was working on a critical technology that would benefit the ALMDS program . . . . Together we were attempting on this contract to obtain additional Navy funds for advancing this SBIR. While there was a valid requirement the Navy funding was first approved and later we were told the SBIR Navy funds had been reduced and our follow on efforts would not be funded. Your IRAD was a good faith attempt to keep progress going as at the time we had been told our Navy follow on efforts were simply delayed. We did not ask nor direct you to make the IRAD decision.

(App. supp. R4, tab S-56; tr. 2/23)

22. Mr. Williams testified that Voxtel did not claim in its ICPs any direct costs recorded under the COGS account. However, he also testified that he did not review

7

the entries for the FY 2007-2009 ICPs.  Instead, he stated that he "would expect to find IR&D expenses and indirect tools . . . [claimed under the COGS account], all these kinds of things used by engineers that can't be applied to a specific cost objective." (Tr. 2/32)

23.  IR&D costs are not broken out separately in the ICPs from other indirect costs (tr. 2/112).  Mr. Williams explained his understanding of how direct and indirect costs can be distinguished in the COGS account:

> A The direct costs are all reported for a job number.  So they apply to a specific job, which would be the contract job number in our system.  And then an indirect cost would have an indirect charge number, whether it be a tool cost or an [IR&D] cost I think are the primary categories that would be there.
>
> Q So if a cost has a job number, you would treat that as a direct cost?
>
> A Well, I think it's important to separate.  Maybe it's a lexicon but when you say job or tracking number, a job being a specific contract number is a direct cost.  In our accounting system, there is the accounting number and the designator, where there is where the cost objective is, whether it is specific or nonspecific.  The contract number that's in that account is a direct cost.
>
> Q So it's a subaccount in the cost of goods sold?
>
> A It's a double-number system.  So it's not a sub-account. . . .  You can sort on either the contract number or you can sort on the accounting number.  It's just a typical double – a double-number tracking system.  One tracks the cost objective, the other accounting – the accounting number.

(Tr.2/113-14)

24.  Mr. Williams testified that this method of tracking IR&D costs has been subject to review by both DCAA and DCMA over the years, and neither agency has ever expressed any concerns (tr. 2/32-33).

25.  In his testimony, Mr. Williams only discussed job numbers in the abstract – he did not discuss any specific job numbers that Voxtel assigned to IR&D costs.  He

was also unable to confirm whether Voxtel has any written procedures describing how its IR&D costs should be identified.  (Tr. 2/114-16)

26.  As part of its supplement to the government's Rule 4 file, Voxtel produced its Financial and Accounting Standards and Internal Controls manual (hereinafter Accounting Manual), which in Section 20.0, Cost Accounting, states in part:

**20.1.4 Cost Identification**

All costs are identified as to the following characteristics: Direct and Claimed, Direct and Unclaimed, Indirect and Claimed, or Indirect and not Claimed.

Direct costs shall be further identified by project.

**20.1.4.1 Indirect Costs**

Indirect costs are further identified based on the following classifications:

- Fringe Benefits or Labor Burden
- Overhead
- General & Administrative

These classifications create cost pools for purposes of allocation to cost objectives.

. . . .

**20.2.1 Project Number Structure**

The project number should have three segments:

First, the three letter identification of the client (DOD for example) followed by

Second, the last two digits of the year when the contract was issued

Third, the last four digits of the contract number.

Additional segments may be added to meet contract requirements or in the interest of good business

9

management.  Examples of additional suffixes would be to track CLINS or preproduction costs.

. . . .

**20.2.6 Unclaimed Costs (Unallowable)**

The majority of unclaimed costs Voxtel experiences shall be G&A costs and are easily dealt with by utilizing the 9XXXX accounts and not including them in government claims.

On the rare occasion where there is a direct expense Voxtel chooses not to claim.  These costs will be burdened just as claimed costs with associated indirect costs.  The entire amount is then unclaimed.

(App. supp. R4, tab S-40 at 36-40)

*Discussions Between the Parties concerning COGS*

27.  By email dated February 19, 2015, Ms. Hilliard requested that Voxtel "explain what is included in the Cost of Goods Sold account . . . in the claimed indirect pool" (R4, tab 21 at 250).  Voxtel responded that "[t]hese are all purchases of services and materials purchased directly for commercial sales or government contracts" (*id.* at 249).  On the basis of this answer, Ms. Hilliard advised DCMA that these direct costs should be charged as such, and recommended that they be 100% excluded from the indirect pool (*id.* at 248).

28.  In March 2015, DCMA supervisor Deborah Wada assigned ACO Musgrave to review Ms. Hilliard's workpapers on Voxtel's ICPs (R4, tab 21 at 247).  In a May 1, 2015 email, ACO Musgrave requested a conference call between herself and Voxtel representatives, and described her questions about Voxtel's ICPs in detail.  With respect to the COGS account, she noted the following:

> Cost Of Goods Sold-Account No. 5000.  Amounts were questioned for Cost of Goods Sold due to lack of supporting documentation.  Voxtel provided response indicating these were costs for services and materials purchased direct for contracts.  Explanation and supporting documentation are needed.

(R4, tab 24 at 415)

10

29.  The conference call took place on May 8, 2015, with Ms. Ozuna and Mr. Williams participating on behalf of Voxtel.  ACO Musgrave's notes summarizing the parties' discussion with respect to the COGS account state the following:

> Amounts $274,162.31, $150,963.36, and $161,494.62 for FY2007, 2008, and 2009 respectively were questioned for Cost of Goods Sold due to lack of supporting documentation.  Voxtel provided response to DCAA indicating these were costs for services and materials purchased direct for government contracts.
>
> During discussions Debra shared for those years they did not assign Job #s to any commercial work and directed their bookkeeper to log any work without job # to overhead.  Debra also confirmed the cost of goods sold was for goods purchased directly for both commercial and government work and agreed it should not have been included as indirect.

(R4, tab 49 at 2200)

30.  On May 14, 2015, ACO Musgrave prepared a draft indirect cost rate/allocation agreement based upon the information she had been provided to date from Voxtel.  She forwarded it to Ms. Ozuna and asked that she advise whether Voxtel would agree to the proposed arrangement.  (R4, tab 25)  Ms. Ozuna responded the same day, indicating that Voxtel would not agree, and stating the following with respect to the COGS account figures:

> Turns out that I was wrong.  We have materials costs related to IR&D in this account that until recently we weren't assigning job numbers to.  These costs went directly into this account, but because they weren't purchases for specific jobs, they weren't assigned a job number and are considered overhead costs.  As such, the amounts in the overhead section for this account are correct.

(R4, tab 24 at 409)

31.  At ACO Musgrave's request, the following day Ms. Ozuna confirmed ACO Musgrave's understanding that "[m]aterial costs related to IR&D are in this account.  Also cost associated with jobs that did not have a job number assigned and so were deemed appropriate to charge indirect."  (R4, tab 26 at 432)

11

32. On the basis of Voxtel's multiple representations, ACO Musgrave's general impression with respect to the COGS account data was as follows:

> I really felt that I had been provided so many various explanations for what was in this account, including direct costs, and there had been no additional documentation provided. It was unclear that there was additional documentation that would be coming. Because of the cost principles in FAR 31, no documentation was provided, it was not clear to me that it did include IR&D costs, so due to lack of supporting documentation and the potential inclusion of direct costs in that account, I disallowed the costs for all three years.

(Tr. 1/132-33)

*Conclusions Regarding COGS in COFD*

33. By final decision dated July 13, 2015, ACO Musgrave formalized her impressions with respect to the costs included in the COGS account:

> I am disallowing Costs of Goods Sold for FYs 2007, 2008 and 2009 in the amounts of $274,162.31, $150,963.36, and $161,494.62 respectively . . . . Voxtel initially explained that costs in this indirect pool were direct costs for commercial and government contracts. Voxtel said that during these years job numbers were not assigned to commercial contract work and so all direct commercial work was charged in this account as an indirect charge. Voxtel later explained that this account consisted of IR&D material costs, as well as work that did not have a job number assigned . . . . No documentation was provided to substantiate that this account included IR&D material costs or to otherwise establish these costs as allowable indirect expenses. Voxtel has failed to show that any of the costs in the account bear a causal/beneficial relationship to government work or otherwise meet the FAR allocability tests. Thus, due to lack of documentation and direct work inclusion in this overhead account, I am disallowing these costs.

(R4, tab 29 at 457)

12

*Additional COGS Information Provided by Voxtel After Issuance of the COFD*

34.  At some point after ACO Musgrave issued her final decision, Voxtel provided DCMA with additional information relevant to the COGS issue for FY 2007-2009 (gov't br., Proposed Finding of Fact [GPFF] ¶ 99 (citing R4, tabs 50, 52-53; tr. 1/130-32)).

35.  Job numbers that include both a contract number and the identifier "VOXR&D" are at the heart of the parties' dispute with respect to the allowability of IR&D costs.  The government contends that the presence of a contract number in those job numbers is conclusive on the question of whether those costs were indirect or direct.  Voxtel disagrees, arguing that the addition of the identifier "VOXR&D" signified that the cost was an allowable IR&D cost.  (*See generally* gov't br. at 40-41; gov't reply at 18-19; app. br. at 38; app. sur-reply at 8-11)

*COGS Data for FY 2007*

36.  For FY 2007, the government's Rule 4 file contains a one-page document that ACO Musgrave testified was "provided subsequent to the issuance of the COFD, supporting documentation for [the COGS] account" (tr. 1/130; R4, tab 50).  It lists costs using one of the following job numbers:  allowable indirect, VOXR&D:Job 1, or NSWC C3024:VOXR&D (R4, tab 50).  On the basis of the information contained in this document, ACO Musgrave revised her opinion and determined that the costs for job numbers allowable indirect ($86,852.07) and VOXR&D:Job 1 ($126,265.65) were allowable indirect costs (tr. 1/130; GPFF ¶ 102; R4, tab 50).  However, the costs for job number NSWC C3024:VOXR&D she viewed as direct and therefore unallowable costs because "C3024" correlated with a Department of Defense contract Voxtel performed in 2007 and 2008 (*see* tr. 1/130-31, 186-87).  The total cost associated with job number NSWC C3024:VOXR&D is $61,044.59 (R4, tab 50).

37.  In its supplement to the Rule 4 file, Voxtel produced documentation that appears to list all of the costs recorded in the COGS account for FY 2008, both direct and indirect (app. supp. R4, tab S-24).  The documentation also includes a summary of the costs which provides totals by job number.  In addition to the costs already found to be allowable by ACO Musgrave (allowable indirect and VOXR&D:Job 1), this summary includes the costs for job number NSWC C3024:VOXR&D – NSWC C3024, listed as $61,044.59.  (*Id.* at 1) We find that this job number represents the same cost account as job number NSWC C3024:VOXR&D, found in the government's documentation, given the name similarities and the fact that the dollar amounts for both are identical (*id.*, R4, tab 50)

13

*COGS Data for FY 2008*

38.  ACO Musgrave testified that the documentation for FY 2008 and FY 2009 was provided later than the documentation provided for FY 2007 (tr. 1/131).  Because it was "significantly different" from the documentation provided for FY 2007, she requested that it be reviewed by Ms. Hilliard (*id.*; tr. 1/188).  This information was submitted to the Board by the government as part of its Rule 4 file (R4, tabs 52-53).

39.  The 2008 information consists of a 34-page document; our review of that document shows that the first page summarizes Ms. Hilliard's analysis of the data appearing on the following 33 pages (tr. 1/131-32; R4, tab 52).  The data on the subsequent 33 pages is presented in the form of individual job numbers, including allowable indirect and VOXR&D:Job 1 (R4, tab 52 at 2224-27, 2251-54).  Other job numbers are more complex, with prefixes consisting of federal agency names/abbreviations (or other prefixes, the meaning of which are unknown), and a several digit/letter string, such as ARMY CP406:AR, DOE 18025, HARR 59407:HAR, and NASA AA27C:NA (*See, e.g.*, R4, tab 52 at 2227, 2231, 2238, 2240).  None of these more complex job numbers include the full VOXR&D identifier; however, one job number includes what appears to be a truncated version thereof:

> NSWC C3024:VO          $44,875.04

(R4, tab 52 at 2242)

40.  Ms. Hilliard's analysis of the 2008 documentation lists the total dollar amount for allowable indirect as $59,295.02 and for VOXR&D:Job 1 as $44,095.30 (R4, tab 52 at 2220), both amounts which ACO Musgrave now considers to be allowable (tr. 1/131-32).

41.  In its supplement to the Rule 4 file, Voxtel submitted documentation that appears to list all of the costs recorded in the COGS account for FY 2008, both direct and indirect (app. supp. R4, tab S-30).  The submission also includes a summary of the costs which provides totals by job number.  In addition to the costs already found to be allowable by ACO Musgrave (allowable indirect and VOXR&D:Job 1), this summary lists two job numbers that include the VOXR&D identifier:

> HARR 59407:VOXR&D – HARR59407          $14,922.00
> NSWC C3024:VOXR&D – NSWC C3024          $44,875.04
>                                                            $59,797.04

(App. supp. R4, tab S-30 at 1)  Thus Voxtel's documentation includes one job number that did not appear in the documentation provided by the government – HARR 59407:VOXR&D – HARR59407.

14

42. We find that for the 2008 COGS data, job number NSWC C3024:VOXR&D – NSWC C3024, found in Voxtel's documentation, represents the same cost account as job number NSWC C3024:VO, found in the government's documentation, given the name similarities and the fact that the dollar amounts for both are identical. (*Id.*; R4, tab 52 at 2242)

*COGS Data for FY 2009*

43. The 2009 documentation submitted in the government's Rule 4 file consists of a 23-page document; our review of that document shows the first page summarizes Ms. Hilliard's analysis of the data appearing in the following 22 pages (R4, tab 53). Like the data provided for 2008, the data provided for 2009 is presented in the form of individual job numbers, including allowable indirect and VOXR&D:Job 1 (R4, tab 53 at 2271-72, 2278). There are also a total of five sets of job numbers that include the VOXR&D identifier or what appears to be a truncated version thereof:

| | |
|---|---|
| DOE 84919:VOXR& | $ 3,000.00 |
| Hex Array:VOXR&D | 64,402.34 |
| NASA AA27C:VOXR | 50,000.00 |
| NSWC C3024 VOXR | 10,870.00 |
| SMDC C0126:VOXR | 30,320.00 |
| | $158,592.34 |

(R4, tab 53 at 2265-67, 2273-74). Numerous other entries, however, consist of agency names/abbreviations and a several digit/letter string without the VOXR&D identifier, such as ARMY CP005 and DOE 18025 (R4, tab 53 at 2256-58, 2260-62)).

44. Ms. Hilliard's analysis of the 2009 documentation lists the total dollar amount for allowable indirect as $642.28 and for VOXR&D:Job 1 as $2,260 (R4, tab 53 at 2255). ACO Musgrave now considers those amounts to be allowable (tr. 1/132, *see* GPFF ¶ 105).

45. In its supplement to the Rule 4 file, Voxtel submitted documentation that appears to list all of the costs recorded in the COGS account for FY 2009, both direct and indirect (app. supp. R4, tab S-36). The submission also includes a summary of the costs which provides totals by job number. In addition to the costs already found to be allowable by ACO Musgrave (allowable indirect and VOXR&D:Job 1), this summary lists five job numbers that include the VOXR&D identifier:

| | |
|---|---|
| DOE 84919:VOXR&D-DOE 84919 | $ 3,000.00 |
| NASA AA27C:VOXR&D-NASA AA27C | 50,000.00 |
| NSWC C3024:VOXR&D-NSWC C3024 | 10,870.00 |
| RAY 72094:VOXR&D-RAY 72094 | 64,402.34 |

15

SMDC C0126:VOXR&D-SMDC C0126       <u>30,320.00</u>
                                           $158,592.34

(App. supp. R4, tab S-36 at 1)

46.  We find that for the 2009 COGS data, the job numbers in both the government's Rule 4 file and Voxtel's supplemental Rule 4 file that include the VOXR&D identifier (or a truncated version thereof) represent the same cost accounts, given that the names are substantially the same and the associated costs for each are identical (*id.*; R4, tab 53 at 2265-67, 2273-74).

47.  In evaluating which costs she considered allowable and which she considered unallowable, ACO Musgrave focused on Ms. Ozuna's prior assertion that IR&D costs were not assigned job numbers, along with the fact that many of the job numbers "specifically identified contracts" (tr. 1/187; *see* R4, tab 24 at 409). ACO Musgrave did not interpret those job numbers to represent IR&D costs (tr. 1/187).

48.  Neither Ms. Hilliard nor ACO Musgrave discussed their analysis of the subsequently provided documentation with any Voxtel representative (tr. 1/189). ACO Musgrave indicated that had Voxtel provided that information earlier, it "would likely have been acceptable documentation as it pertain[ed] to allowable indirect costs and Voxtel R&D costs" (tr. 1/186).  However, to the extent that documentation included "multiple contract direct job numbers that [were] tied to specific contracts [and were] easily identifiable" she would not have found those costs to be allowable (*id.*).

49.  Although the data contained in the 2007-2009 COGS account documentation submitted separately by the government and by Voxtel is largely consistent, none of the individual job numbers in the data provided to the Board appear to conform to the formulation for "project numbers" described in Section 20.2.1 of Voxtel's Accounting Manual, which states that [t]he project number should have three segments . . . [beginning with] the three letter identification of the client . . . [followed by] the last two digits of the year when the contract was issued . . . [and then] the last four digits of the contract number" (app. supp. R4, tab S-40 at 38-39; *see also* R4, tabs 50, 52-53; app. supp. R4, tabs S-24, S-30, S-36).  For this reason, we find that this provision of Voxtel's Accounting Manual is not determinative for purposes of distinguishing between Voxtel's direct and indirect costs.

50. Voxtel's expert witness, Mr. Paul Cederwall, has a bachelor's degree in business administration – accounting from California Polytechnic State University, and a master's degree in administration from Central Michigan University (ex 133 at 403). He is licensed as a certified public accountant in both Washington and California (*id.*; tr. 2/125). For approximately 32 years, he was an auditor with DCAA, retiring as the manager of a branch office. During his time at DCAA, he had extensive experience with auditing, including the auditing of incurred cost proposals (tr. 2/124), and specifically the issues involved in this appeal (IR&D, rent, and compensation) (tr. 2/125). Since 2006 he has been a chief financial member of Pacific Northwest Consultants, LLC, a firm providing advisory services in government contracting accounting, auditing and other areas. (Ex. 133 at 403-04) He has been working with Voxtel as a client since the issuance of the COFD (tr. 2/127). Voxtel proffered him, and he was accepted, as an expert witness in the area of cost allowability and tax as it interrelates with the FAR cost principles (tr. 2/130-31).

51. Mr. Cederwall authored an expert report dated August 28, 2017 (ex. 133).[5] The report laid out a chronology of the interactions between the government and Voxtel and critiqued the sufficiency of the audit process, which he described as "nothing more than the identification of accounts where significant variability existed within the three-year period under review" (*id.* at 329). Attached to the report were several exhibits that consisted primarily of accounting data representing those costs (*id.* at 337-55, 380-97 (exs. E-H)). Chief among Mr. Cederwall's criticisms of DCAA's work is the description of the review as a "quick informal look" at Voxtel's ICPs for 2007-2009; nowhere in DCAA's guidance, contract audit manual, audit programs, or instructions are "quick informal looks" described or authorized (*id.* at 341-42, 347, 353). Mr. Cederwall described DCAA's evaluation of Voxtel's ICPs as "not well-supported" (tr. 2/184). There was no audit performed and simply no reason an audit could not have been performed (tr. 2/136-40). Mr. Cederwall noted that an adequacy review was not an audit, and did not support the conclusions reached by the government, and while the nomenclature review was a "good first step," it was "not conclusive in itself; you still need to do transaction testing. It's just a way of identifying where your risks are." (Tr. 2/185).

---

[5] Mr. Cederwall subsequently provided Voxtel with a brief addendum to this report. That addendum, dated September 1, 2017, does not materially impact any of our findings or conclusions in this decision. (*See* ex. 134)

*Mr. Cederwall's Opinion on the Data Contained in the COGS Account*

52. In performing his analysis of Voxtel's ICPs, Mr. Cederwall relied on the propriety of Voxtel's accounting policies, practices and procedures. DCAA performed pre-award accounting system reviews in 2003 and 2007, and in 2015, at the request of DCMA, performed another audit of Voxtel's accounting system, finding it adequate for government contracting. (Ex. 133 at 341) On the basis of that 2015 audit, Mr. Cederwall opined that Voxtel's methodology for accumulating and reporting IR&D costs was adequate (tr. 2/134). He further opined that an adequate accounting system "can be relied upon to ensure that costs are properly accounted for and allocated to final cost objectives in a manner that meets government contracting requirements" (ex. 133 at 341).

53. Mr. Cederwall testified that Voxtel tracks COGS using a "job cost system," and "as transactions are entered into the system, they are identified to . . . a contract or an IR&D project" (tr. 2/155, 157). Unique job numbers are established for each government contract and for each IR&D project (ex. 133 at 337). Relying upon Voxtel's accounting system (which DCAA had found to be adequate for government contracting), Mr. Cederwall opined that the type of costs reported under the COGS account for each FY 2007-2009, including those associated with IR&D, should be considered allowable (ex. 133 at 341; tr. 2/163).

54. Mr. Cederwall also testified that Voxtel's IR&D costs consist of materials, labor, and other direct costs, yet DCAA and DCMA objected only to the materials portion of the IR&D costs, which in his opinion is an inconsistent treatment of the costs – if you object to materials, "certainly the labor is going to follow suit" (tr. 2/161-63; *see also* tr. 2/158-59; ex. 133 at 339 (noting same inconsistency)).

55. Exhibit E to Mr. Cederwall's expert report consists of six pages of job numbers representing "IR&D Materials Charged to Cost of Goods Sold" during FY 2007-2009 (ex. 133 at 381-86). This documentation is consistent with the portion of Voxtel's documentation that reflects job numbers using the VOXR&D identifier (*id.*; *see* app. supp. R4, tabs S-24, S-30, S-36). It is also consistent with the government's documentation (see R4, tabs 50, 52, 53), with one exception. For 2008, Exhibit E includes job number VOXR&D – HARR 59407, the total cost for which is listed as $14,922.00. (*See* ex. 133 at 383; app. supp. R4, tab S-30 at 1 (reflecting substantially the same job number with identical associated cost))

*Rental Expenses*

*Background*

56.  At its inception in 1999, Voxtel was located in Portland, Oregon, but later moved to Beaverton,[6] a Portland suburb.  In 2009, Voxtel opened a second site at the University of Oregon in Eugene.  (Tr. 2/13-14)  The costs associated with a lease between Voxtel and the University of Oregon during 2009 are the focus of the parties' dispute with respect to rental expenses.

*Discussions Between the Parties Concerning Rental Expenses*

57.  In her initial February 19, 2015 email to Ms. Ozuna, Ms. Hilliard requested clarification on Voxtel's rental expenses, noting that "[t]he amount claimed for Rent in the indirect pool varies significantly year over year.  Can you please explain the reason for these variances?  Does this involve a related party?"  (R4, tab 19 at 240).  Ms. Ozuna responded as follows:

> Up until 2011, the rent expenses fluctuated based on the amount of square footage we were renting at our two facilities.  One in Beaverton, OR, the other in Eugene, OR. We moved into a facility owned by a related party, the rent claimed, since that time is based on the DCAA guidelines using percentage of building occupied and actual costs.

(*Id.* at 240-41) Ms. Hilliard considered this explanation to be insufficient, and recommended to DCMA that unless Voxtel provided additional detailed information on the questioned rental expenses they should be 100% excluded from the indirect pool (R4, tab 21 at 248-49).

58.  ACO Musgrave's May 1, 2015 email to Ms. Ozuna requesting the conference call stated the following:

> Rent - Account No. 7400.  Amounts questioned for FY2009 for Rent due to lack of supporting documentation and significant unexplained variance in rent costs between 2008 to 2009.  Voxtel explained the rent expenses fluctuated based on square footage being used/rented at the

---

[6] The Beaverton location is referred to variously by the parties and in the record as "Beaverton," "Beach Metro" and "the Round at Beaverton" (*see, e.g.*, tr. 1/127-129; R4, tab 24 at 425).  For purposes of this decision, we will refer to that location as the "Beaverton property."

19

two facilities.  Explanation and supporting documentation are needed.

(R4, tab 22 at 402)

59.  ACO Musgrave's notes of the call itself state that Ms. Ozuna "indicated [Voxtel] could provide specific lease agreements to verify and support cost of rent. [Voxtel] was advised to refer to FAR 31.205-36(b)(3) which provides specific guidance for rental costs."  (R4, tab 49 at 2200)

60.  Voxtel did not provide any lease-related documents until after ACO Musgrave forwarded to Ms. Ozuna the draft indirect rate/cost allocation agreement.  At that time, Ms. Ozuna provided what she described as the first page of the lease agreements for both locations.  (R4, tab 24 at 409)

61.  The first document was actually the first page of a summary of basic provisions contained in the lease between Voxtel and the University of Oregon.  That page identified the landlord, the tenant, the premises, the term of the lease and the amount of the rent ($5,620 per month for the first year and rent for subsequent years to be determined).  (R4, tab 24 at 424)  ACO Musgrave considered this document to be "acceptable documentation of a lease agreement" (tr. 1/115).

62.  The second document was the first page of a letter dated April 26, 2005 on a commercial realtor's letterhead addressed to Mr. Williams.  That document indicated it was intended to "confirm your expressed intent to lease office space under the following terms and conditions" and that the "Tenant agrees to extend its existing lease to be coterminous with the expansion Lease."  (R4, tab 24 at 425).  It also identified the premises (the Beaverton property), the lease term and a rental rate that appears to be a rate per square foot.  (*Id.*)  ACO Musgrave did not consider this document to be sufficient documentation of the lease agreement or the increased rental costs (tr. 1/115-16).

63.  ACO Musgrave emailed Ms. Ozuna on May 15, 2015 stating that in the purported lease agreements, she did not "see the amount specified for [the University of Oregon lease] for the period of May 1, 2009 through April 30, 2010.  I also do not see any verification of the square footage leased for 2009 in Beaverton, only the rate per sq foot."  (R4, tab 26 at 432)  Ms. Ozuna replied via email later that day, stating that she would "review what I sent you for rent verification and make sure that I provide what's needed to accurately reflect rent" (*id.*).

*Conclusions Regarding Rental Expenses in COFD*

64. With respect to rental costs, the COFD provided the following:

> I am disallowing Rent costs for FY 2009 in the amount of
> $144,799.87 in accordance with FAR 31.205-36—Rental
> Costs. Regarding the unsupported significant increase in
> rental cost for 2009, Voxtel explained that two facilities
> were leased that year and the cost was based on square
> footage utilized. As supporting documentation for one of
> the properties Voxtel provided only a letter of intent to
> lease and said the actual lease agreement would be
> produced, but after additional inquiries, no lease or other
> supporting documentation was provided. A letter of intent
> is insufficient supporting documentation. Due to lack of
> adequate documentation, I am disallowing $144,799.87,
> which is the unsupported portion of the 2009 rental costs.

(R4, tab 29 at 458)

*Additional Rental Expense Information Provided by Voxtel After Issuance of the COFD*

65. After issuance of the COFD Voxtel submitted transaction details for the questioned rental expenses at the Beaverton property (tr. 1/128-29; R4, tab 47). At the hearing ACO Musgrave testified that she would allow the rental costs for the Beaverton property that had previously been in dispute (tr. 1/129).

66. With respect to the University of Oregon location, the transaction detail Voxtel submitted shows 22 payments of $5,620.00 each, for a total of $123,640.00 in calendar year 2009 (R4, tab 47). ACO Musgrave had already found that 12 months of those lease payments were allowable, but disallowed the remaining 10 payments (tr. 1/129, 203).

67. After filing this appeal in 2015, Voxtel submitted two documents in its supplement to the Rule 4 file which purportedly relate to the challenged rental costs at the University of Oregon location. The first document is an email from an employee in the Office of the Vice President for Research and Innovation at the University of Oregon. It is dated June 9, 2015, addressed to Voxtel's president, and states in its entirety that "[i]n 2009, Voxtel's rent was $11,440." (App. supp. R4, tab S-51)

68.  The second document is one page in length and is entitled "Confirmation of Payment Schedule of Voxtel-UO Lease: YEAR 2009" (hereinafter Confirmation of Payment) (app. supp. R4, tab S-59).  This document was signed on February 11, 2016 by the Assistant Vice President for Research Business Administration, Office of Research and Innovation, at the University of Oregon, and on February 22, 2016 by Mr. Williams.  The document states in its entirety:

> Summary
>
> This is to confirm that the lease payments for the space occupied by Voxtel at the Lorry Lokey Laboratories have been made as noted below on a continuous basis by Voxtel from January of 2009 through the date noted in the signature below.
>
> Payment arrangements made under the 2009 Lease between UO and Voxtel
>
> Starting in January 2009, two payments of $5620 were due each month January through August ($11,240 per month), after that time, payments of $5620 were due on a monthly basis, increasing according to the terms of the lease.

(*Id.*)

69.  Mr. Williams described the second document, the Confirmation of Payment signed in February 2016, as an "addendum or amendment" to the University of Oregon lease (tr. 2/34; *see also* tr. 2/89).  To explain this purported amendment, he testified that Voxtel was required to use "all union labor . . . to move our stuff in and out of the facility and to hook up all our electricity.  Even to hang white boards on the wall required State of Oregon employees."  (Tr. 2/16)  He further testified that

> this was a new facility.  It was being run by a professor. And one of the things that they didn't realize was that we could not do our own fit-up costs on the facility.
>
> So we signed the lease and as it evolved, we had to modify the lease based on circumstances, which included us not being able to actually authorize any, even as much as I said hanging a white board on the wall in that facility.

(Tr. 2/90) This meant that the University had expenses it had not anticipated, which required the parties to modify the lease (tr. 2/90-91).

22

70. This so-called "amendment" purporting to modify the lease was "created so that our records would be consistent with actual practices" (tr. 2/34). The employee who originally negotiated the purported amendment, however, subsequently left the company and Voxel was unable to locate the emails where it was documented (tr. 2/91).

71. Mr. Williams conceded that he did not believe signing an amendment in 2016 made it "retroactive to 2009" (tr. 2/89-90).

72. After the initiation of this appeal, Voxel submitted to the Board and the government a full copy of the University of Oregon lease. The lease indicates it is for space located within the Lorry Lokey Laboratories Building on the University of Oregon campus. Executed on May 1, 2008, it had a lease term of three years with two possible two-year extensions (app. supp. R4, tab S-28 at 1-2, 7, 26).

73. Section 3 of the lease defined Voxel's obligation to pay rent and any other charges due under the lease. Under Section 3.1, Rent, on the first day of each month Voxel was to pay a "Base Rent" of $5,620. This amount was for the first year of the lease, which began to run on May 1, 2008; subsequent year charges were to be determined at the beginning of those years. (App. supp. R4, tab S-28 at 2, 8-9)

74. Section 3 of the lease also referenced Voxel's obligation to pay any "Additional Rent" due, defined in Section 3.4 as "[a]ll taxes, insurance costs, utility charges and/or any other amount Tenant is required to pay by this Lease, and any other sum that Tenant is required to pay Landlord or third parties" (app. supp. R4, tab S-28 at 8-9).

75. Section 6 of the lease, Alterations and Improvements, defined the rights and obligations of the parties with respect to any changes made to the premises. Under Section 6.1, Landlord Improvements, the University of Oregon had no obligation to perform any improvements or alterations upon the premises. This section also stated that the premises were being leased in an "'as-is/where-is' condition." Section 6.2, Tenant Improvements, prohibited Voxel from making any alterations or improvements to the premises without the University's prior written consent. (App. supp. R4, tab S-28 at 13)

76. Section 14 of the lease contained provisions dealing with various other issues. Section 14.6, Complete Agreement, provided as follows:

> There are no oral agreements between Landlord and
> Tenant affecting this Lease, and this Lease supersedes and
> cancels any and all previous negotiations, arrangements,
> brochures, agreements and understandings, oral or written,

23

if any, between Landlord and Tenant or displayed by Landlord to Tenant with respect to the subject matter of this Lease, the Premises or the Building. There are no implied or express representations between Landlord and Tenant or between any real estate broker and Tenant other than those contained in this Lease, and any reliance with respect to any representations is solely upon representations contained in this Lease. This Lease may not be amended or modified in any respect whatsoever except by an instrument in writing signed by Landlord and Tenant.

(App. supp. R4, tab S-28 at 24)

77. There is nothing in any section of this lease referring to an obligation on Voxtel's part to pay fit-up costs in any amount.

*Appellant's Expert Witness on Rental Costs*

78. Mr. Cederwall's written report did not discuss the allowability of any specific rental costs. Instead, it merely stated the following:

DCAA should not have questioned 100 percent of claimed rent expenses for 2007, 2008, and 2009 nor should the ACO have questioned most of the rent expense incurred in 2009. Rental costs are specifically allowable under FAR 31.205-36. . . . There simply is no valid basis for taking exception to these costs.

(Ex. 133 at 344)

79. In his testimony, Mr. Cederwall conceded that a deposit should not have been claimed, and that rent from January 2010 should have been reported to 2010, not 2009 (tr. 2/190-91).

80. Since the hearing, the parties have reduced the amount of the disputed rental expenses to a total of $44,960, consisting of the eight additional monthly rental payments of $5,620 each made in January through August 2009 by Voxtel to the University of Oregon. These payments were purportedly for the fit-up costs. (App. br. at 33-34; app. sur-reply br. at 11; gov't reply br. at 16-17)

_Executive Compensation (Unpaid Owner's Salary)_ [7]

_Background_

81. Voxtel personnel, including Mr. Williams, used timecards to track the work they performed on a daily basis. Mr. Williams' time is billed at a fixed rate of between $90 and $95 an hour for the time periods at issue. Voxtel produced copies of monthly time sheets as part of its supplemental Rule 4 file showing Mr. Williams' work on a daily basis for calendar years 2007 and 2009. (Tr. 2/11-12; app. supp. R4, tabs S-26, S-35)

82. Mr. Williams testified that during the relevant time period, Voxtel recorded some of his compensation as wages on his IRS Form W-2 and the remainder on a "K-1," which is Schedule K-1 to IRS Form 1120 S, the tax form used by subchapter S corporations. The K-1 Schedule records the shareholder's share of income, deductions, credits and so forth. (Tr. 2/46; _see generally_ R4, tabs 43-45)

83. This separate, non-W-2 compensation is referred to in Voxtel's ICP data as "Sub S Owner's Unpaid Salary" (_see, e.g._, R4, tab 18 at 162, 200, 236). However, Voxtel contends that "unpaid salary" is a misnomer, that the term (or a variation thereof) has been used as a "placeholder," and that the funds were in fact actually paid to Mr. Williams (tr. 2/74; _see also_ tr. 2/181).

84. According to Mr. Williams, the rationale for allocating his compensation in this manner arises out of an audit DCAA conducted in 2003. At that time the government expressed concern about Voxtel's cash flow, stating that it wanted to make sure Voxtel would have sufficient cash reserves to continue performance if extraordinary circumstances occurred (tr. 2/38, 40-41). As a result of that discussion, and at DCAA's suggestion, Mr. Williams elected to begin reinvesting a portion of his compensation into the company (tr. 2/41-42). This process was allegedly accomplished through the writing of two checks, one of which was "to be deposited to a separate bank account . . . for paid in capital" (tr. 2/42).

85. On cross-examination Mr. Williams was asked "how do you determine whether you're going to pay [your salary] or reinvest it" (tr. 2/91). Mr. Williams testified as follows:

> We actually pay all of it. The portion that's actually then
> sent to the paid-in capital account changes year to year but
> it's usually everything in excess of the minimum that --

---

[7] Throughout the record this issue is referenced the majority of the time as "unpaid owner's salary;" accordingly, for purposes of consistency we will use that term.

you know right above the payroll level, the FICA level, which changes year to year.

And in addition, we'll pay out, as necessary, we may pay out with a direct check. I may take additional pay, as needed with a direct check as well.

(Tr. 2/91)

86. Mr. Williams was also asked to provide further explanation concerning "the way you paid yourself the reinvested salary. You said that you write a check to a bank account? I'm trying to understand what your process is." (Tr. 2/99). Mr. Williams responded as follows:

> Sure. You know without it, I'll just go over the first part of the process. And I think we established the timecards are entered, the payroll account is debited, and that's the same as mine or any other account. And then from that, checks are written in the employee's name, it could be mine, to a savings account. And there's any number of several savings accounts. So one way would be we write the check then to an account that payroll money could use to a savings account.
>
> And then also, we can write a check in my name, which is a two-part check. One will go to distributions and the other would go to a paid capital account. That's a typical method that would be used.
>
> Q Okay and then what happens to that? What happens to that cash?
>
> A Well, the W-2 portion, the payroll company then writes a check in the employee's name. And then on the distribution, it's distributed out at the end of the year to me. It passes through to me as the sole shareholder.
>
> Q Are you paid cash?
>
> A It's a distribution, yes.
>
> Q You receive a distribution?

A Yes, it's not a service. It's not a good. It's a monetary value, a dollar value transaction.

Q Does the money remain inside the company?

A No, the money transitions to me.

Q The money transitions to you?

A As through the pass-through entity is my understanding, yes. All the revenues and liabilities are going to passed [sic] through to the shareholder at the end of the year.

(Tr. 2/99-101)

87. Mr. Williams did not disclose any identifying information about the "separate bank account . . . for paid-in capital" (tr. 2/42), such as the bank name or account number. The record also does not contain evidence such as bank statements or cancelled checks from this or any particular bank account.

88. We were nevertheless able to locate references to three different bank accounts in the record – a U.S. Bank account, a Washington Mutual account, and a Chase Bank account. Those references appear in two different documents. The first is a "check detail" dated December 31, 2012, which indicates it is for account number 1040, U.S. Bank – Checking – 8769 (R4, tab 20 at 246).[8]

89. The second document is a 30-page journal of accounting entries for calendar year 2007 (app. supp. R4, tab S-23). This document contains references to all three bank accounts. The U.S. Bank account appears at monthly intervals on debit entries valued at $0.00 (*see, e.g.*, app. supp. R4, tab 23 at 12, 14-16 (January through April 2007)). There are also three credit entries for account number 1020, Washington Mutual. Two of those entries include dollar values ($1,300 and $75,000), immediately followed by debit entries in the corresponding amount to account 2600, Distributions (*id.* at 6). Finally, there is one credit entry for account number 1060 – Chase Bank – entry number 7795 in the amount of $194,860.50, immediately followed by a debit entry in the same dollar amount to account 2600, Distributions (*id.* at 30).

90. DCMA submitted Voxtel's corporate tax returns (IRS Form 1120 S) for 2007-2009 in its Rule 4 file (R4, tabs 43-45). The figures on line 7 of those returns, which record" Medicare Wages and Tips," are identical to the figures recording

---

[8] This document is discussed in more detail in finding 97.

27

Mr. Williams' W-2 wages for all three years – $98,988 for 2007, $110,524 for 2008, and $143,153 for 2009[9] (R4, tabs 40-42, 43 at 2097, 44 at 2215, 45 at 2139).

91. Line 21 of the Form 1120 S records "ordinary business income (loss)" (*see, e.g.*, R4, tab 43 at 2097). This figure is reached by subtracting from gross receipts (at line 1c) certain deductions such as officer compensation, employee salaries, repairs, maintenance, employee benefit programs and so forth (*see id.*). Line 1 of Schedule K-1 (hereinafter referred to as K-1 distribution) records the same figure as the figure entered at line 21 for "ordinary business income (loss)" (*id.* at 2098, 2106).

92. Voxtel produced Mr. Williams' individual tax returns for the relevant three-year period. Voxtel's corporate tax returns or Mr. Williams' individual tax returns do not specifically identify that portion of the K-1 distribution that represents Mr. Williams' non-W-2 wage compensation (R4, tab 43 at 2106-07, tab 44 at 2125-26, tab 45 at 2148-49; *see* tr. 2/18, 79; exs. 107 at 208-09, 108 at 94, 110 at 120).

93. Contractors submitting ICPs are required to reconcile wages they've reported quarterly on IRS Form 941 with their claimed payroll account (tr. 1/41). For FY 2007, the reconciliation recorded as unpaid owner's salary is the same amount ($194,064.10) as is recorded on the trial balances in account 4050, Other Income, an entry Ms. Hilliard characterized as an "offsetting amount" (tr. 1/41-42; R4, tab 21 at 260, 262, 298). The correlation in these entries is also true for FY 2008 – the same amount ($21,933.41) is recorded as unpaid owner's salary in the reconciliation as is recorded on the trial balances in account 4050, Other Income (tr. 1/42-43; tab 21 at 311, 313, 344).

94. The same is not true, however, for FY 2009. The reconciliation recorded unpaid owner's salary in the amount of $141,995.86, while the trial balances recorded $165,850.58 in account 4050, Other Income. With respect to that discrepancy in amount, Ms. Hilliard suggested that "[i]t's possible that the contractor had additional other income in that year that was recorded in that account." (Tr. 1/43-44; R4, tab 21 at 357, 360, 394)

*Discussions Between the Parties Concerning Owner's Unpaid Salary*

95. In her February 19, 2015 email to Ms. Ozuna, DCAA auditor Hilliard requested information about the costs Voxtel identified in the ICPs as unpaid owner's salary:

---

[9] The figure on line 7 of Mr. Williams' tax return for 2009 has been rounded up to the next dollar, as compared to the figure in his 2009 W-2 (*compare* R4, tab 42 at 2092 *with* R4, tab 45 at 2139).

28

For each year, was the unpaid owner's salary claimed as a direct cost or included in the indirect pool? Which GL account was used for the expense? Has this salary been paid and if so, can you please provide dates and proof of payment?

(R4, tab 21 at 250)

96. Ms. Ozuna responded via email dated March 8, 2015, stating in part:

The pay was based on hours worked and were charged to the account listed on the time card. The accounts included indirect hours, which involved corporate business, and direct engineering hours. The salary was paid both in monthly payroll, and some was kept on reserve in as "other income" to the corporate [sic]. An example of how the hours/payroll for the "Other Income" are accounted for is attached. This was discussed with our DCAA auditor back in 2005/2006.

The paid in capital was needed to purchase equipment and finance operations.

(R4, tab 19 at 240)

97. The following day Ms. Ozuna provided a copy of the example mentioned in her March 8, 2015 email (R4, tab 20 at 243). That document is the "check detail" dated December 31, 2012 for account number 1040, U.S. Bank – Checking – entry number 8769 (*id.* at 246). This document shows a series of accounting entries, the first for account number 4050, Other Income, in the amount of $13,538.80. That entry is followed by 25 debit entries in various amounts identified as being from account number 7700, Payroll, and adding up to $13,538.80. (*Id.*) Because this document appears to relate to activity outside the time period of this appeal, we consider it of limited evidentiary value to our decision.

98. After reviewing Voxtel's response, by email dated March 11, 2015 Ms. Hilliard advised DCMA of the following:

The unpaid owner's salary was not paid. The contractor claimed the cost in the indirect pool and recognized these costs as income to the company. Debra Ozuna did provide a copy of a "payment" to the owner in which the net amount equals zero and the total is recorded as other

29

income.  These costs should be 100% excluded from the indirect pool.

(R4, tab 21 at 248-49)

99.  On May 1, 2015, ACO Musgrave requested a conference call with Voxtel, and ACO Musgrave described her question about unpaid owner's salary in the following manner:

> Payroll - Account No. 7700.  Amounts questioned for unpaid [owner's] salary.  Explanation provided to DCAA regarding payroll stated [owner's] salary was both paid monthly and some kept on reserve as 'other income'.  Explanation and supporting documentation are needed.

(R4, tab 22 at 402-03)

100.  ACO Musgrave's notes from the May 8, 2015 conference call state the following with respect to this issue:

> Explanation provided to DCAA regarding payroll stated [owner's] salary was both paid monthly and some kept on reserve as 'other income'.
>
> During discussions Debra and George (owner) explained the owner charges hourly wage and bills either direct to a job or indirect.  A varying portion of each billing is paid to the owner and the remainder of his billed hours (both direct and indirect work) are expensed in "unpaid owner's salary" and reinvested in the company as "other income" to avoid paying the associated payroll tax.[10] Voxtel did not have an explanation for how the choice is made for what hours will be paid out to the owner and which will be expensed in the overhead pool. . . . Voxtel will provide additional documentation with samples of owner's hours billed/hours paid/hours expensed to help clarify.

---

[10] Voxtel denies having ever stated that it was attempting to avoid payroll tax, or that it was in fact engaging in such action (tr. 2/69-70).  The government has not used the statement to support its claim that such costs were unallowable.  The Board therefore makes no finding with respect to the statement in ACO Musgrave's notes and considers the statement irrelevant for purposes of this appeal.

(R4, tab 49 at 2200-01)

101. After ACO Musgrave emailed Ms. Ozuna the draft indirect rate/cost allocation agreement, Ms. Ozuna forwarded to her a sample paystub and a "$0.00 check," which she described as "show[ing] how these transactions are entered. Additionally, since the $0.00 check doesn't actually show the breakdown of the costs" she indicated she was also providing a "transaction list for the payroll account that shows both the paycheck and the $0.00." (R4, tab 24 at 409)

102. The documents Ms. Ozuna provided consist of the following: 1) a check made out to Mr. Williams dated August 31, 2009 in the amount of $8,049.95 for the pay period August 1 through 14, 2009, attached to a check stub showing a description of his current and year-to-date earnings, deductions, taxes and adjustments; 2) another document dated August 31, 2009 with the words "0.00 Check To Charge Hours [and] Record Owner Investment" handwritten across the top and including a list of figures, none of which include a correlating description or explanation; and 3) a document titled "Transaction Detail By Account" for August 2009 with 29 entries and handwritten at the bottom "payroll account: snapshot of both checks showing hours and jobs charged" (R4, tab 24 at 418-20). Some of the entries on this last page have handwritten asterisks next to them; the handwriting at the bottom of the document identifies the source as George Williams)" (*id.* at 420).

103. ACO Musgrave considered these documents to be "inconclusive" because they contained no information indicating that the unpaid owner's salary was ever actually paid. They had no impact on her opinion regarding whether the unpaid owner's salary figures were allowable (*see* tr. 1/118-19).

104. ACO Musgrave's subsequent request that Ms. Ozuna confirm Voxtel's position concerning this issue stated as follows:

> Payroll - Account No. 7700: You've provided a sample paystub and the $0.00 check. Also a transaction list for the payroll account that shows both the paycheck and the $0.00. From discussions I understand the owner charged direct and indirect when appropriate, for the portion of payment due that the owner decided to not be paid but to reinvest back to the company it was charged in "unpaid owners expense" and also specified in "other income".

(R4, tab 26 at 432)

105. Ms. Ozuna replied to ACO Musgrave later that day, stating the following:

31

[Y]es, that's correct.  Except, it wasn't charged to unpaid owner's expense.  The hours on the $0.00 check are charged at [Mr. Williams'] rate against both direct and non-direct to payroll and then offset to other income.

(R4, tab 26 at 432)

*Conclusions Regarding Unpaid Owner's Salary*

106.  With respect the unpaid owner's salary, the COFD provided:

> I am disallowing Payroll costs, specifically regarding "unpaid owner's salary" costs, for FYs 2007, 2008 and 2009 in the amounts of $194,064.10, $21,933.41, and $149,995.86 respectively . . . . Voxtel maintained during discussions that the owner charged direct and indirect when appropriate, however, the owner only took a portion of the wage earned as payment.  The remainder for each job was charged as unpaid owner's salary and redistributed back into the company in "Other Income". In addition, the portion of any individual job charged to unpaid owner's salary was varied by individual job and included portions unpaid for both direct and indirect work. Voxtel also [stated] . . . that unpaid owner's salary was designated as a method to reinvest a portion of the owner's earned salary . . . [and] the funds were not actually paid out but were instead funneled back into the company accounted for as "Other Income".  However, for owners of closely held corporations such as Voxtel, FAR 31.205-6(a)(6)(iii) specifies that compensation in excess of the costs deductible as compensation under the tax code provisions of 26 U.S.C. are unallowable.  Even if not in violation of FAR 31.205-6, FAR 31.201-5 requires that income relating to any allowable costs and received by or accruing to the contractor shall be credited to the Government either as a cost reduction or by cash refund; therefore, I am disallowing these costs.

(R4, tab 29 at 458)  At the time of the hearing the ACO's opinion had not changed; in her view "[u]npaid owner's salary is an unallowable cost, according to federal regulation.  Clearly, it is in excess of what was paid.  It was a credit back to the company.  Both of those make it an unallowable cost." (Tr. 1/130)

32

107.  To determine the additional compensation that Voxtel alleges is included in Mr. Williams' K-1 distributions, his W-2 wages must be subtracted from his total compensation.  That information appears in three tables for 2007-2009 at  Exhibit H of Mr. Cederwall's expert report.  (Ex. 133 at 395-97; *see also* tr. 2/177, 214)

108.  Each table consists of between 25 and 29 entries representing payments made to Mr. Williams on or about the last day of each month of the year, out of the 7700 – Payroll account.  Some of the entries record the payment type as "check" and some record it as "paycheck."  (Ex. 133 at 395-97).  In a column entitled "Split," those recorded as "check" read "1040 US B..." (truncated) and those recorded as "paycheck" read "1030 Payc..." (truncated).  (*Id.*)

109.  The three tables show Mr. Williams' total compensation as being $293,848.50 for 2007, $307,548.81 for 2008, and $309,003.48 for 2009 (*id.*).  Subtracting his W-2 wages for those three years,[11] the portion of the K-1 distributions that would allegedly be attributable to Mr. Williams' unpaid salary are $194,860.50 for 2007, $197,024.81 for 2008, and $165,850.58 for 2009.

110.  In his report, Mr. Cederwall noted the discrepancy between the above figures and the dollar amounts ascribed by DCAA to unpaid owner's salary:

> According to DCAA, the amount of "unpaid salary" was determined from Schedule L of the incurred cost submissions.  Based on my analysis of Voxtel's accounting records, these amounts were inaccurate.  I was unable to determine the source of the amounts included in the Schedule L's or replicate those totals.  The following schedule shows a comparison of what amounts questioned by DCAA (and DCMA) with the amounts supported by Voxtel's accounting records.

---

[11] Mr. Williams' W-2s show "Medicare Wages and Tips" for 2007-2009 as $98,988.00 for 2007, $110,524.00 for 2008 and $143,152.90 for 2009 (R4, tabs 40-42).

| Year | Unpaid Salary per DCAA[12] | Salary Included on Form K-1 |
|------|------|------|
| 2007 | 194,064 | 194,861 |
| 2008 | 21,933 | 197,025 |
| 2009 | 141,996 | 165,851 |

(Ex. 133 at 355) The figures identified as "unpaid salary per DCAA" are substantially the same as the figures appearing on the reconciliation of IRS Form 941 with the claimed payroll account (*see* findings 93-94).

111. Mr. Cederwall opined that the methodology employed by Voxtel in accounting for compensation costs to government contracts was appropriate, allowable and calculable (tr. 2/172). Mr. Cederwall verified the compensation paid to Mr. Williams in 2007, 2008 and 2009, and found it to be consistent with Voxtel's accounting records; that is, the amount of Mr. Williams' compensation correlated to the time sheets that Mr. Williams billed (tr. 2/214). His review also verified that the compensation reflected in the W-2 and K-1 was paid to Mr. Williams (tr. 2/177), and was reported on his personal tax returns (2/178). Mr. Cederwall further testified that the allocation of compensation between the W-2 and the K-1 did not alter the costs recorded on Voxtel's books (tr. 2/174, 176). He found that the unpaid salary amounts were charged to both the indirect cost pool and as direct costs to specific final cost objectives (ex. 133 at 351).

112. Mr. Cederwall testified that compensation through a K-1 distribution was not unusual. It did not represent an unallowable distribution of profit. Mr. Cederwall considered it allowable compensation because of the "job cost system that they have set up, where they are using timecard[s]. They are using hourly rate[s]. They are posting those transactions into the accounting records, into the job cost records." (Tr. 2/180) He further stated that the method of payment is not relevant, it's merely the manner in which Voxtel chose to account for the transaction, and there is no restriction in the FAR that would limit the payment of compensation to a W-2. Mr. Cederwall testified that in his opinion, the real question is whether Voxtel has an adequate system for labor tracking and labor distribution and whether there is anything unreasonable about the amount of compensation. (Tr. 2/180) These issues were not challenged by the ACO in her decision.

113. Mr. Cederwall further testified that ordinary business income or loss is not simply a distribution of profit, but could include "many other components," including some of Mr. Williams' compensation (tr. 2/201-02, 205). Mr. Cederwall did not

---

[12] The figures on this table were rounded up by Mr. Cederwall.

identify or ascribe dollar values to any of the "many other components" included in the ordinary business income (loss) figures recogrded on Voxtel's tax returns (tr. 2/201).

114. Mr. Cederwall explained in his expert report that FAR 31.205-6(d) broadly defines allowable compensation to include cash, corporate securities such as stocks, bonds, and other financial instruments, or other assets, products, or services (ex. 133 at 353). He further stated that under FAR 31.205-6(a)(6)(ii), compensation for owners of closely held businesses must be reasonable for the work performed and not be a distribution of profits. He noted that the FAR does not liken the W-2 with compensation or the K-1 with profit, and that a K-1 is not exclusively a distribution of profit. (*Id.* at 354)

115. In his expert report, Mr. Cederwall also challenged the government's contention that any compensation not reported on IRS Form W-2, Wage and Tax Statement, is unallowable on government contracts. Contrary to the government's stated position that the income reported on a K-1 represents a distribution of profits, Mr. Cederwall explained that the FAR does not limit allowable compensation to amounts reported on Form W-2. By way of illustration, he pointed out that Mr. Williams was compensated in 2008 for 777 hours at $95.50 per hour, and 2,344 hours at $99.55 per hour, for a total of 3,121 hours and $307,549 in total compensation. Of that total compensation, $110,524 was reported on his W-2, while the remaining $197,025 was included on his K-1. The K-1 for 2008, however, showed income to Mr. Williams of $1,077,281, which Mr. Cederwall explained included the $197,025 in compensation that was not distributed on Mr. Williams' W-2. As Mr. Cederwall noted, "[t]he difference between the $1,077,281 and the $197,025 in compensation is $880,256. . . . [which] could be a distribution of profits but has not been claimed as an expense by Voxtel. The full amount, $1,077,281 was considered in the preparation of Mr. Williams' personal income tax return for 2008." (Ex. 133 at 354) Mr. Cederwall further noted that DCMA stated that it was not challenging the reasonableness of Mr. Williams' compensation but was challenging the method of payment. He then explained that calculating Mr. Williams' compensation on the basis of his W-2 wages only, his effective rate of payment would be $32, $35 and $46 per hour for the calendar years 2007-2009 respectively. Mr. Cederwall stated that those rates were "not commensurate with Mr. Williams['] position in the company, his educational background, his experience, knowledge, skills, and abilities." (Ex. 133 at 353-354)

116. Mr. Cederwall testified that the government applied Mr. Williams' K-1 compensation to the indirect costs only, instead of prorating it against the various cost objectives (tr. 2/181). The significance of this application was that the government was taking away more than Voxtel booked, which had the effect of Mr. Williams paying the government for every hour he "work[ed] indirect" (tr. 2/182).

Stated differently, the government erroneously disallowed more costs than the contractor charged (*id.*).

117. In his written report, Mr. Cederwall opined that the "credit" provision found at FAR 31.201-5 does not apply in these circumstances, because the unpaid owner's salary was not credited to the contractor or Mr. Williams as sole shareholder but was reported as income to Mr. Williams (ex. 133 at 352-353). At the hearing, Mr. Cederwall testified that it was unclear to him why ACO Musgrave stated in the COFD that she was disallowing the unpaid owner's salary under authority of the credits clause, FAR 31.201-5, when "[t]here was no income generated from these wages. . . . [Y]ou can't invoke [the credits] clause if there's no income" to the company (tr. 2/184). On cross-examination, the government did not challenge Mr. Cederwall's opinion with respect to whether FAR 31.201-5 applies.

<u>DECISION</u>

*Allowability in General*

Our analysis is guided by the regulations in effect at the time the contracts were executed. *The Boeing Co.*, ASBCA Nos. 57549, 57563, 13 BCA ¶ 35,427 at 173,786. Under FAR 31.201-2, the costs at issue in this appeal are allowable if they meet the following requirements: they are reasonable, allocable, and they comply with generally accepted accounting principles and practices appropriate to the circumstances, the terms of the contract, and any limitations set forth in FAR subpart 31.2. *See* FAR 31.201-2(a)(1)-(5); *Fiber Materials, Inc.*, ASBCA No. 53616, 07-1 BCA ¶ 33,563 at 166,251. It is incumbent on the contractor to provide adequate supporting data to support its indirect cost proposal. *See* FAR 52.216-7(d)(2)(i). But the government bears the burden of proof to demonstrate that a cost is unallowable. *Technology Sys., Inc.*, ASBCA No. 59577, 17-1 BCA ¶ 36,631 at 178,389; *Johnson Controls World Servs., Inc.*, ASBCA Nos. 46674, 47296, 96-2 BCA ¶ 28,464 at 142,166 (citations omitted).

With respect to the first requirement of allowability – reasonableness – a cost will be considered reasonable if "in its nature and amount, it does not exceed that which would be incurred by a prudent person in the conduct of competitive business." FAR 31.201-3(a). However, "[n]o presumption of reasonableness shall be attached to the incurrence of costs by a contractor." *Id.* If an "initial review of the facts results in a challenge of a specific cost by the contracting officer . . . the burden of proof shall be upon the contractor to establish that such cost is reasonable." *Id.*

Determining reasonableness "depends upon a variety of considerations and circumstances," including-

> (1) Whether it is the type of cost generally recognized as ordinary and necessary for the conduct of the contractor's business or the contract performance;
>
> (2) Generally accepted sound business practices, arm's-length bargaining, and Federal and State laws and regulations;
>
> (3) The contractor's responsibilities to the Government, other customers, the owners of the business, employees, and the public at large; and
> (4) Any significant deviations from the contractor's established practices.

FAR 31.201-3(b).

The FAR also imposes upon contractors the obligation to maintain sufficient documentation to support their incurred costs:

> [a] contractor is responsible for accounting for costs appropriately and for maintaining records, including supporting documentation, adequate to demonstrate that costs claimed have been incurred, are allocable to the contract, and comply with applicable cost principles in this subpart and agency supplements. The contracting officer may disallow all or part of a claimed cost that is inadequately supported.

FAR 31.201-2(d).

Voxtel protests that the COFD, issued without the benefit of an audit or understanding of Voxtel's accounting system and practices, lacks factual and legal support. But the findings of fact made by a contracting officer in a COFD are not binding in any subsequent judicial proceeding. *TPI Int'l Airways, Inc.*, ASBCA No. 46462, 96-2 BCA ¶ 28,373 at 141,695 (citing *Melvin Wilner d/b/a Wilner Construction Co. v. United States*, 24 F.3d 1397, 1401 (Fed. Cir. 1994)). A judicial proceeding following a contracting officer's decision proceeds *de novo*, which precludes reliance upon the contracting officer's decision. *Id.* Once an action is brought before the Board, the parties start with a clean slate. *Id.* We now turn to the specific costs at issue in this appeal.

*Allowability of the IR&D Costs Reported Under the COGS Account*

The parties' dispute concerning the COGS account turns on whether some of the costs included in that account represented indirect IR&D costs rather than direct costs attributable to a specific contract. Under the FAR, "direct cost" is defined as

> any cost . . . identified specifically with a particular final cost objective. Direct costs are not limited to items that are incorporated in the end product as material or labor. Costs identified specifically with a contract are direct costs of that contract. All costs identified specifically with other final cost objectives of the contractor are direct costs of those cost objectives.

FAR 2.101. The FAR defines an "indirect cost" as "any cost not directly identified with a single final cost objective, but identified with two or more final cost objectives or with at least one intermediate cost objective." *Id.* "Indirect cost rate" is defined as "the percentage or dollar factor that expresses the ratio of indirect expense incurred in a given period to direct labor cost, manufacturing cost, or another appropriate base for the same period." *Id.*

The FAR further defines IR&D costs as costs from projects "falling within the four following areas: (1) [b]asic research, (2) applied research, (3) development, and (4) systems and other concept formulation studies." FAR 31.205-18(a). IR&D costs do not include "the costs of effort sponsored by a grant or required in the performance of a contract." *Id.* Thus IR&D costs are allowable as indirect expenses on contracts to the extent they are allocable and reasonable. *See* FAR 31.205-18(c); *see also* FAR 31.203(b) (indirect costs are those that can be allocated to two or more final cost objectives).

DCMA cites the conflicting and contradictory statements Voxtel originally made concerning whether the COGS account included direct costs only, or both direct and indirect costs (gov't br. at 40; gov't reply br. at 18). DCMA further asserts that costs associated with job numbers that include a contract number were attributable to a specific contract and were therefore direct costs (gov't br. at 40-41). DCMA points to the description in Voxtel's Accounting Manual for how direct costs are to be identified, stating that the ACO relied upon this methodology in disallowing costs in the COGS account that were "identified with a client, year and contract number" (gov't reply at 18; *see* finding 26).

In response, Voxtel argues that the relevant signifier for determining whether costs are IR&D costs is the identifier "VOXR&D." For example, "HARR 59407:VOXR&D – HARR59407" signifies that the entry represents IR&D efforts by

38

Voxtel. As additional support for this assertion, Voxtel points to the testimony of Mr. Williams regarding Voxtel's practice of tracking IR&D costs by contract and reporting them annually under the SBIR program.[13] (App. br. at 38; app. sur-reply br. at 8-10)

DCMA does not respond to Mr. Williams' testimony regarding the SBIR program. Instead, DCMA makes the very narrow assertion that Voxtel "provided no testimony or supporting documentation . . . [that it identified] IR&D work with the letters R&D" (gov't reply br. at 19; *see also id.* at 4 (response to APFF ¶ 45)). While it is true that no witness testified with respect to the VOXR&D signifier, the government's assertion ignores the voluminous data contained in the record showing that Voxtel routinely included VOXR&D in certain job numbers – data that was submitted separately by DCMA and Voxtel in their respective Rule 4 submissions, and by Mr. Cederwall in his expert report, all of which is virtually identical in nature (*see* findings 36-46, 55). DCMA does not dispute the authenticity or veracity of this data but focuses its criticism at Voxtel's expert for his failure to audit the COGS account or perform transaction testing (GPFF ¶¶ 37, 107). Ironically, the same criticism could be leveled at the government (findings 7, 10, 13). As the DCAA audit manual indicates, a nomenclature review alone is not a sufficient basis to reject a category of indirect expenses. Instead, "[t]he actual content of accounts being evaluated must be established through testing of transactions" (finding 12), something the government has not done here.

Instead, DCMA's position rests heavily on ACO Musgrave's conclusion that costs associated with job numbers tied to specific contracts were direct costs (*see* findings 47-48; gov't br. at 41; gov't reply br. at 18-19 (asserting relevance of contract number)). DCMA's reliance on the description of Voxtel's Accounting Manual concerning how direct costs are to be identified—three letters for the client, two digits for the contract year, and four digits for the contract number—is simply not credible given that none of the accounting data in the record appears to follow that formulation (*see* gov't reply at 18; findings 26, 49).

While it is clear that Voxtel's conflicting statements concerning the COGS account confused DCAA and DCMA early on and made it difficult to determine which costs were direct or indirect (findings 27-32), after the COFD was issued, Voxtel submitted a significant quantity of data to the government showing specific cost entries in the COGS account that included both a contract number and the VOXR&D identifier (findings 34, 36, 38-40, 43-44). Voxtel's supplement to the Rule 4 file also included much of the same data (findings 37, 41-42, 45-46). We must take this

---

[13] While Voxtel does not identify the specific statutory or regulatory basis for this obligation, DCMA does not deny that it exists.

evidence into consideration given the *de novo* nature of our review. *See Wilner v. United States*, 24 F.3d 1397, 1401-02 (Fed. Cir. 1994).

We acknowledge that the evidence presented by Voxtel to support the IR&D costs was long overdue, not always easily understood, and in some instances contradictory. However, we find persuasive the cumulation of evidence represented by 1) the data Voxtel submitted; 2) confirmation from government personnel that the IR&D work was related to NSWC C3024; 3) Mr. Williams' detailed explanation of the naming convention; and 4) his explanation of how IR&D costs are billed to contracts. (Findings 19-23, 36-46)

Equally persuasive are the review and conclusions reached by Voxtel's expert, Mr. Cederwall (although the government appears to give little weight to his testimony). Contrary to the government's assessment, we find that Mr. Cederwall's education, professional background and experience demonstrate an extensive knowledge in the area of government contracts, allowability of costs, DCAA practice and procedures, and audits (both generally and specifically with respect to ICPs). Similarly, Mr. Cederwall's extensive professional background and history demonstrates his knowledge of accounting and tax issues relating to the FAR. Without objection, Mr. Cederwall provided helpful testimony concerning the IR&D issue. (Findings 50-54). He discussed the reliability of Voxtel's accounting system, and his opinion that an adequate accounting system can be relied upon to ensure that costs are properly accounted for and allocated to the final cost objective. (Finding 52). Thus, while Voxtel's accounting system may have been unsophisticated, it does not affect the credibility of the documentation provided in support of the costs claimed.

In addition, Mr. Williams' testimony concerning the manner of tracking Voxtel's SBIR costs, together with Mr. Cederwall's review of the accounting of the claim costs, supports the inference that the job numbers in the COGS account that included the "VOXR&D" identifier were intended to record IR&D costs Voxtel incurred at its own expense (findings 20-24, 36-46, 49, 52-53, 55). The inclusion of a contract number was designed to identify the contract inspiring the IR&D work for SBIR reporting purposes, not to signify that the entry represented a direct cost associated with a contract. We find that consistent with FAR 31.201-2(d), appellant has met its burden of proof and adequately demonstrated that the IR&D costs claimed in this appeal have been properly incurred and accounted for and were reasonable. (Findings 36-46)

The government bears the burden of proof in demonstrating that a cost is unallowable by operation of a specific contract provision or regulation. *Kellogg Brown & Root Services, Inc.*, ASBCA No. 56358 *et al.*, 14-1 BCA ¶ 35,639 at 174,521. We do not believe the government can meet its burden of demonstrating that the claimed IR&D costs are unallowable on this record. DCMA only contends

that the costs are unallowable. The government has presented no evidence adequately demonstrating that the costs claimed were not properly included with the IR&D efforts or that they were double counted. There has been no challenge to the amount or reasonableness of the claimed costs. As the Board has previously held:

> Where there is no dispute over the reasonableness in nature or amount of costs incurred, nor over the allocability of amounts charged to a contract, and the Government seeks to disallow costs solely upon the basis they are 'unallowable,' as here, the Government bears the burden of proving that the costs are of the type made specifically unallowable by regulation or contract provision.

*Johnson Controls World Servs., Inc.*, 96-2 BCA ¶ 28,464 at 142,166 (citing *Lockheed-Georgia Co.*, ASBCA No. 27660, 90-3 BCA ¶ 22,957 at 115,276; *Rockwell Int'l Corp.*, ASBCA No. 20304, 76-2 BCA ¶ 12,131 at 58,302). Not only did the government make inadequate attempts to challenge the costs by way of audit, but little attempt was also made through testimony or supportable arguments to show that the costs claimed here were unallowable by contract or regulation or did not include costs of efforts sponsored by a grant or required in the performance of another contract (findings 10-13, 51, 115-16). *See* FAR 31.205-18(c). While DCAA determined that each of Voxtel's ICPs for fiscal years 2007-2009 were adequate for audit a decision was made not to audit them (finding 13). Even after Voxtel responded to the COFD with additional and substantial data, ACO Musgrave disregarded that data – although she conceded in testimony that had Voxtel provided it earlier "it would likely have been acceptable documentation as it pertain[ed] to allowable indirect costs and Voxtel R&D costs" (finding 48; *see also* finding 47). On this record, the government has not demonstrated that any particular IR&D cost claimed by Voxtel in the 2007, 2008 or 2009 ICP was unallowable (findings 51, 54).

"[P]arties are responsible for presenting their cases so that the Board can make appropriate findings of fact and conclusions of law thereby disposing of the merits of the appeal." *Trace, Inc.*, ASBCA No. 56594, 09-1 BCA ¶ 34,128 at 168,750; *see United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991); *Nassar Grp. Int'l*, ASBCA No. 58451 *et al.*, 22-1 BCA ¶ 38,206 at 185,550; *Env'l Chem. Corp.*, ASBCA No. 59280, 22-1 BCA ¶ 38,166 at 185,362; *Meld LLC v. GSA*, CBCA Nos. 6357, 6721, 22-1 BCA ¶ 38,040 at 184,736. The record here contains little evidence to conclude that the IR&D costs are unallowable. Accordingly, based upon our review of the evidence in this appeal we find the IR&D costs disallowed by the Government in

the amounts of $61,044.59 (2007), $47,573.04 (2008),[14] and $158,592.34 (2009) for a total of $267,209.97 are allowable (findings 36-46).

### *Allowability of the Rental Costs at the University of Oregon Location*

DCMA challenges the allowability of eight rental payments of $5,620 each (January through August 2009)**,** alleging that they have not been adequately documented as required under FAR 31.201-2(d) (gov't br. at 38-40). DCMA argues that the Confirmation of Payment document, which Mr. Williams characterized as an amendment to the University of Oregon lease, should be given no evidentiary weight. DCMA notes that the document does not even purport to be a lease amendment, and that it appears to have been created in 2016 for the sole purpose of supporting the additional 2009 rental payments (the so-called "fit-up" costs). DCMA also alleges that Mr. Williams' testimony regarding this document constituted parol evidence that should be disregarded. (Gov't br. at 39)

The government also discounts the 2015 email from the University's Office of Vice President for Research and Innovation. DCMA points out that it is not signed by either party and post-dates the expiration of the lease, and therefore should also be given no evidentiary weight. (Gov't reply br. at 17)

Voxtel concedes that the payments for fit-up costs were not authorized under the terms of the original lease itself (APFF ¶ 107 (such costs were "not included as a condition of Voxtel's lease")). Voxtel contends, however, that the record is still sufficient to find these costs allowable. According to Voxtel, the Confirmation of Payment and the 2015 email, read in conjunction with the lease and proof of payment, and considered with Mr. Williams' testimony regarding fit-up costs, all constitute the adequate support that DCMA contends is missing. (App. br. at 34-35 (citing APFF ¶¶ 106-11)) Voxtel also disputes DCMA's contention that Mr. Williams' testimony regarding the Confirmation of Payment constituted parol evidence that should be excluded from consideration (app. br. at 35).

The documentation submitted by Voxtel simply does not support a finding of allowability. The Confirmation of Payment is dated February 22, 2016, seven years after the payments were made, and after the initiation of this appeal. Mr. Williams conceded it was created after the fact so that Voxtel's records would be "consistent

---

[14] We note that in briefing this issue, the dollar figure DCMA identified as unallowable COGS/IR&D costs for FY 2008 is $47,573.04 (gov't br. at 42). Although Voxtel noted that the source of this figure is "unclear" (app. br. at 36 n.9), and it differs from our calculation of the IR&D costs for FY 2008 (*see* findings 38-42), this is the figure that Voxtel requested the Board find allowable for FY 2008 (app. br. at 50).

with actual practices" and that it was not retroactive to 2009. (Finding 70, *see also* finding 68, 71) The 2015 email is dated six years after the payments were made and is not even factually accurate, as Voxtel only paid the dollar figure identified in the email for the first eight months of 2009, not the entire year (findings 67, 80).

The Confirmation of Payment also does not qualify as an "amendment" to the lease, as Mr. Williams appeared to claim in his testimony (finding 69; *see also* findings 68, 70). It is true that, as argued by Voxtel, the document is a writing signed by the parties, which Section 14 of the lease requires (finding 76; *see* app. br. at 35 (citing Section 14.6 of the lease)). However, to be a valid amendment under Oregon law,[15] the document still must contain all of the elements necessary to find the existence of a contract. *See Glaser v. Haskin*, 140 Or. 392, 398 (1932) ("The proposition that a prior contract may be modified or rescinded by a subsequent contract implies that such subsequent contract must have the elements necessary to the formation of a valid original contract.") (internal citation omitted).

The elements of contract formation include "(1) whether both or all parties . . . manifest objectively an intent to be bound by the agreement; (2) whether the essential terms of the agreement are sufficiently definite to be enforced; (3) whether there is consideration; and (4) whether the subject matter of the agreement and its performance are lawful." 1 WILLISTON ON CONTRACTS § 3:2 (4th ed.). The Confirmation of Payment falls far short of this standard. It does not manifest any intention to be bound by future obligations; by its title it indicates it was drafted merely to confirm that the payments were actually made, and its substance recounts only the historical fact that "[s]tarting in January 2009, two payments of $5620 were due each month January through August" (finding 68). It also does not describe any consideration for Voxtel in exchange for the increased payments (*id.*)

Moreover, none of the documentary evidence described above states the rationale for the payments or shows that the payments were authorized under the lease terms. This information is necessary because determining allowability also requires us to determine whether the costs were reasonable. This is true under both the general FAR cost principle on allowability and the specific cost principle relating to rental costs. *See* FAR 31.201-3(a)-(b); FAR 31.205–36(b).

Under the general allowability principle, to be reasonable these costs "in [their] nature and amount" must not "exceed that which would be incurred by a prudent person in the conduct of competitive business." FAR 31.201-3(a). There is no presumption of reasonableness in these circumstances; in fact, if a particular cost is

---

[15] The law of Oregon applies to contracts "for services to be rendered in Oregon, or for goods to be delivered in Oregon, if Oregon or any of its agencies or subdivisions is a party to the contract." Or. Rev. Stat. § 15.320(1).

challenged, the burden of proof switches from the government to the contractor to establish that the cost is reasonable. *Id.*

In his testimony, Mr. Williams stated that Voxtel was required to use union labor "to move our stuff in and out of the facility and to hook up all our electricity. Even to hang white boards on the wall required State of Oregon employees" (finding 69). The government contends that this testimony should be excluded as inadmissible parol evidence[16] (gov't br. at 39). Even if we were to find that this testimony was admissible, it is simply not persuasive. It is the only evidence in the record that provides even a hint of information as to the purported rationale for the fit-up costs.

Without more, it is not sufficient for the Board to evaluate the reasonableness of these costs under the criteria set forth in FAR 31.201-3. From this record we are unable to determine whether 1) the fit-up costs are the type of costs generally

---

[16]The government fails to provide anything more than a bald assertion that the parol evidence rule excludes this evidence, and Voxtel doesn't do much more (gov't br. at 39; app. br. at 35). Determining whether the parol evidence rule should exclude this testimony is a far more complicated analysis:

> The parol evidence rule is a rule of substantive law that prohibits consideration of extrinsic evidence to alter the terms of a written agreement that 'has been adopted by the parties as an expression of their final understanding.'" *Barron Bancshares, Inc. v. United States*, 366 F.3d 1360, 1375 (Fed. Cir. 2004) (citing *David Nassif Assocs. v. United States*, . . . 557 F.2d 249, 256 (Ct. Cl. 1977)). Therefore, a writing that is final and complete is an integrated agreement, and the effect of integration is the inadmissibility of prior or contemporaneous agreements to modify or contradict the terms of the agreement. *See David Nassif Assocs.*, 557 F.2d at 256; RESTATEMENT (SECOND) OF CONTRACTS §§ 213, 215 (AM. LAW. INST. 1981). Where a fully or completely integrated agreement exists, the writing cannot be supplemented with evidence of consistent or inconsistent additional terms or prior agreements that cover the same subject matter. *Rumsfeld v. Freedom NY, Inc.*, . . . 329 F.3d 1320, 1328 (Fed. Cir. 2003); RESTATEMENT (SECOND) OF CONTRACTS §§ 214, 216 [(AM. LAW INST. 1981)].

*U.S. Coating Specialties & Supplies, LLC*, ASBCA No. 58245, 17-1 BCA ¶ 36,710 at 178,759-60.

recognized as being ordinary and necessary to Voxtel's business or for contract performance; 2) the agreement for Voxtel to pay for the fit-up costs was the result of sound business practices and arm's length bargaining, and otherwise complied with applicable law; 3) the nature of Voxtel's obligations to other parties and persons required the fit-up costs to be paid; and 4) paying the fit-up costs was a "significant deviation" from Voxtel's established business practices. *See* FAR 31.201-3(b).

The record also lacks evidence sufficient to satisfy the requirements of the specific cost principle for rental expenses. That cost principle requires that the rental rates be reasonable at the time of the lease decision, after consideration of

> (i) rental costs of comparable property, if any;
>
> (ii) market conditions in the area;
>
> (iii) the type, life expectancy, condition, and value of the property leased;
>
> (iv) alternatives available; and
>
> (v) other provisions of the agreement.

FAR 31.205-36(b)(1). Such evidence would include, at a minimum, the value of the space at the University of Oregon and whether Voxtel had any alternatives to paying double the lease's rental rate for eight months to cover the fit-up costs. *See id.* In the absence of such evidence, the Board cannot determine whether Voxtel's decision to pay this amount was reasonable.

Voxtel argues that the allowability cost principle does not require "'nice neat little files' or contemporaneous records to support the costs claimed in an incurred cost proposal" (app. br. at 34 (quoting *Bearingpoint, Inc.,* ASBCA No. 55354, 09-2 BCA ¶ 34,289)). In *Bearingpoint*, which addressed allocability, not allowability, the record included invoices documenting costs incurred during the contract period, including labor costs for a subcontractor. For the labor costs, the contractor was unable to provide all of the timesheets supporting the invoices but presented three witnesses – including two with personal experience coordinating the subcontractor's services – who testified about the detailed process they used to verify the invoices' accuracy. *Bearingpoint*, 09-2 BCA ¶ 34,289 at 169,387, 169,389-90. The contracting officer conceded at the hearing that the contractor "did have paper records" but stated that they were "a mess. . . . [T]he paper records ideally . . . should tie in, they should have nice neat little files with labels and just something showing the paper backs up . . . the electronic system . . . ." *Id.* at 169,388. The Board held that neither the FAR nor any provision in the contract required the contractor to maintain their records in the manner testified to by the contracting officer, and found in favor of the contractor on

45

the allocability of the labor costs. *Id.* at 169,393. The Board specifically noted that appellant had presented a "robust, prima facie case" that included "credible [witness] testimony . . . [that was] supported by documents." *Id.* Such is not the case here, where there is no credible documentary evidence showing the rationale for the additional payments, and the testimony of only one individual, who did not negotiate the arrangement for the increased rental payments and therefore did not have first-hand knowledge of the parties' discussions – including why double the rent for those eight months was the figure required to reimburse the University for the purported union labor costs (findings 67-71).

Contrast *Bearingpoint* with *Analytical Assessments Corp.*, ASBCA Nos. 52393, 52394, 01-2 BCA ¶ 31,483, where the Board found that the evidence was insufficient to support allowability. In *Analytical Assessments*, the evidence consisted of invoices that summarized in a conclusory fashion only the totals for various cost categories, along with evidence that the services were provided and paid for and the costs were not questioned by the government. *Id.* at 155,426. We consider the nature of the evidence herein to be similar to the evidence described in *Analytical Assessments*, in both its paucity and generality. To find otherwise would "nullify the duty of the [contractor] . . . to adhere to the pertinent FAR record keeping provisions." *Id.* Voxtel has not persuaded us that the additional rental costs meet the requirements of the FAR. We therefore find that DCMA has met its burden of proof with respect to the unallowability of the eight additional payments of $5,620 between January and August 2009, and hold that those payments, totaling $44,960.00, are unallowable.

### *Costs Recorded as Unpaid Owner's Salary*

### *Unpaid Owner's Salary As Unallowable Profit Under the Compensation Cost Principle*

Compensation for personal services is generally allowable, subject to certain exceptions. FAR 31.205-6(a). It includes compensation paid in the form of cash, corporate securities, or other assets, products, or services. FAR 31.205-6(d). Compensation paid to certain individuals (such as owners of closely held corporations, sole proprietors and the like) gives rise to the need for special considerations. FAR 31.205–6(a)(6)(i). For example, compensation paid to such persons must not be a distribution of profits. FAR 31.205-6(a)(6)(ii)(B).

DCMA contends that the unpaid owner's salary was paid to Mr. Williams as a distribution of profit. This argument is premised on Voxtel's claim that the unpaid owner's salary is included in the figure that appears on line 21 of the Form 1120 S and line 1 of Schedule K-1, both of which record ordinary business income/loss (gov't br. at 35-36; gov't reply br. at 12). Defining "profit" as "'net income' for a given period of time" (gov't br. at 36), DCMA argues that because "Voxtel included

46

Mr. Williams' unpaid salary as part of its ordinary income, it is part of [Voxtel's] profit" (*id.* at 36-37). In other words, DCMA is claiming that the figure recorded as ordinary business income/loss on Voxtel's tax returns can only be profit and nothing else.

The government's challenge here suffers from the same defects of proof that plagued the IR&D issue above. The government has done little more than provide wholesale conclusions about the nature of a K-1 distribution. As we have noted, the government decided not to conduct a full audit given the delay it would have caused in the processing of already significantly delinquent ICPs (findings 7, 13). As a result, DCAA's findings and recommendations lacked any real support. Nevertheless, after ACO Musgrave issued her decision and Voxtel filed this appeal, Voxtel provided additional data and information to the government (findings 81, 108, 112, 115). Ultimately, it was that data that allowed the parties to eliminate one issue altogether (depreciation) and to reduce disagreement in other areas (findings 17, 34, 65, 72, 80). While the government's original decision not to conduct a full audit may have made sense at one time, after Voxtel filed this appeal the government was on notice that it would need to prove the costs were unallowable. *See Technology Systems, Inc.*, 17-1 BCA ¶ 36,631 at 178,389 (government bears burden of proof in cost allowability cases). The responsibility was on the government to prove that the compensation in question was profit and therefore unallowable.

Voxtel demonstrated through documents and its expert witness that the compensation claimed on the K-1 was not profit (finding 113-15). Mr. Cederwall reviewed Mr. Williams' compensation for 2007, 2008 and 2009. He compared it with Voxtel's accounting records and time sheets to confirm it all matched and that the allocation of compensation between the W-2 and the K-1 did not alter the costs recorded on Voxtel's books. He verified that the compensation reflected on the W-2 and K-1 was reported on Mr. Williams' personal tax returns (finding 111). Mr. Cederwall opined that compensation through a K-1 distribution did not represent an unallowable distribution of profit (finding 115). Further, based upon his more than 30 years of experience with DCAA, payment through a K-1 distribution as a means of providing compensation for services performed is not a unique practice (findings 50, 112). When asked during the hearing why he considers it to be allowable compensation rather than a distribution of profit, he pointed to Voxtel's job cost system and the use of timecards. "They are using hourly rate[s]. They are posting those transactions into the accounting records, into the job cost records" (finding 112). He testified that the method of compensation was not relevant; it merely reflected how Voxtel accounted for the transactions. The real question was whether Voxtel had an adequate system for labor tracking and labor distribution, and whether there was

47

anything unreasonable about the amount of compensation[17]. DCAA found Voxtel's accounting system to be adequate for government contracting, and Mr. Cederwall concluded that Voxtel's accounting system tracked the costs incurred (findings 52-53, 55). Neither party has pointed to anything in the FAR that requires all compensation to be reported on a W-2. (*Id.*, finding 115)

The government did not present expert testimony or cite any case law directly addressing how a K-1 distribution should be treated for purposes of government contracts cost allowability, and it does not appear that the Board has previously addressed this issue. However, in an analogous context – determining whether a bonus paid to the CEO of a Subchapter S corporation was allowable under FAR 31.205-6(f) or was actually profit and therefore unallowable – the Board examined "several factors to assess when a bonus was actually a distribution of profits: whether any dividends were declared (*i.e.*, whether the bonus was actually a disguised dividend), how large a share of the bonus pool was allocated to the top executive(s), and how 'substantial' the rest of the compensation was." *SplashNote Sys., Inc.*, ASBCA No. 57403, 12-1 BCA ¶ 34, 899 at 171,609. As *SplashNote* indicates, determining the nature of a particular payment or transaction is a fact-specific inquiry.[18]

Appellant argues that Mr. Williams' W-2 wages alone – which are recorded as hourly entries on weekly time sheets – cannot account for all of his compensation; otherwise, he must have worked far fewer hours or have been paid at a much lower hourly rate (app. br. at 41; app. sur-reply br. at 14-15). The weekly time sheets reflect the work performed by Mr. Williams and only make sense when the compensation paid as W-2 wages is combined with the other compensation accounted for in the record. Otherwise, Mr. Williams' compensation would not reconcile with the time

---

[17] There was no challenge by the government that the compensation received by Mr. Williams was unreasonable or excessive.

[18] This fact-specific inquiry is not unique to government contracts cases. In the context of taxation cases, courts routinely examine the "objective economic realities" surrounding a transaction to determine its true nature, regardless of how it is characterized by the parties. *See Boulware v. United States*, 128 S. Ct. 1168, 1171(2008) (citing *Frank Lyon Co. v. United States*, 435 U.S. 561, 573 (1978)). Such determinations should be made "in view of all the evidence." *David E. Watson, P.C. v. United States*, 714 F.Supp.2d 954, 961 (S.D. Iowa 2010). Moreover, in taxation cases evaluating whether dividends are profit or compensation, the "characterization of funds disbursed by an S corporation to its employees or shareholders turns on an analysis of whether the 'payments at issue were made . . . as remuneration for services performed.'" *David E. Watson*, 714 F.Supp.2d at 963 (quoting *Joseph Radtke, S.C. v. United States*, 895 F.2d 1196, 1197 (7th Cir. 1990)).

records and what is recorded on Voxtel's books but would also leave his effective pay rate at $32, $35 and $46 per hour for 2007-2009 respectively. Those rates would not be commensurate with Mr. Williams' position in the company, his educational background, his experience, knowledge, skills and abilities (finding 115). We find that appellant has provided sufficient evidence to demonstrate that the wages paid to Mr. Williams were included in the K-1 distribution. The government has not persuasively challenged otherwise, despite having the burden of proof.

We have made no findings with respect to the correlation between a K-1 distribution and profit. This is not inadvertence but because of the lack of evidence to make such findings. We find that the government has not carried its burden of proof with respect to whether the unpaid owner's salary constituted unallowable profit under FAR 31.205-6(a)(6)(ii)(B).

### *DCMA's Deductibility and Credits Arguments, Which It Appears To Abandon, Are Unpersuasive*

Finally, we note that in its opening brief, DCMA makes two additional arguments addressing the treatment of the unpaid owner's salary. In the first, DCMA correctly points out that as the sole shareholder of Voxtel, Mr. Williams' salary is subject to special scrutiny under FAR 31.205-6(a)(6) (gov't br. at 34). DCMA then correctly argues that because Voxtel did not report the unpaid owner's salary on Form W-2 and did not separately identify it on its corporate income tax return, the unpaid owner's salary was not deductible on Voxtel's income tax return (*id*. at 35) (citing GPFFs ¶¶ 56-57). This argument is based upon a subsection of the compensation cost principles stating that "[f]or owners of closely held corporations, compensation in excess of the costs deductible as compensation under the Internal Revenue Code (26 U.S.C.) and regulations under it are unallowable" (*id.* (citing FAR 31.205-6(a)(6)(iii)). While we agree that Mr. Williams' salary is subject to special scrutiny under FAR 31.205-6 (a)(6), the language in FAR 31.205-6(a)(6)(iii) simply does not support the argument the government is making.

Voxtel challenges the government's use of FAR 31.205-6(a)(6)(iii) and argues, among other things, that DCMA's analysis misinterpreted the plain meaning of that subsection as applying to costs in excess of those *deducted*, when in reality the regulation addresses costs exceeding those that are *deductible* (app. br. at 44). Voxtel also reminds us that the regulatory history of FAR 31.205-6(a)(6)(iii) likewise does not appear to reflect any intent to bar compensation when it is reasonable and within the allowable compensation cap, if any, imposed by the IRS (*id.* at 46). Noticeably absent is any reply by the government responding to these arguments.

By way of illustration, Voxtel points out that IRS Code § 162(m) imposes a $1 million cap on deductible compensation for certain employees of public

corporations (app. br. at 44). A cost that exceeds this cap could form a basis for a challenge under FAR 31.205-6(a)(6)(iii), but that is not the situation we encounter here. The government has produced no evidence demonstrating that Mr. Williams' compensation was beyond that which is deductible under the Internal Revenue Code. Neither is there anything in the record challenging the reasonableness of the compensation received by Mr. Williams and reported in his W-2 forms or through the K-1 distribution. Conversely, the record contains ample evidence tying that reported compensation to the hourly work performed by Mr. Williams for Voxtel (findings 81, 83). We find the government's argument that Mr. Williams' compensation is unallowable on deductibility grounds was not proven and is inconsistent with the language of FAR 31.205-6(a)(6)(iii) limiting "compensation in excess of the costs that are deductible as compensation" under the Internal Revenue Code.

DCMA second additional argument alleges that even if the unpaid owner's salary were allowable, Voxtel was required to credit those amounts back to the government under the credits cost principle, FAR 31.201-5 (gov't br. at 37). DCMA claims that even if the unpaid owner's salary were allowable, FAR 31.201-5 required Voxtel to credit the unpaid owner's salary to the government, which it did not do (*id.*). DCMA justifies its use of the FAR's credit provision by stating that Voxtel "reversed the 'unpaid salary' expense entry on its books with an offsetting amount recorded as 'other income'" (*id.* at 34).

In response, Voxtel notes that the credits cost principle provides that "the applicable portion of any income, rebate, allowance, or other credit relating to any allowable cost and received by or accruing to the contractor shall be credited as a cost reduction or by cash refund" (app. br. at 42) (quoting FAR 31.201-5)). Voxtel argues that a credit under this provision represents a correction for an overpayment, in contrast to what the K-1 distribution represents: Mr. Williams' earned compensation, based upon the labor hours he billed, multiplied by his hourly rate, as evidenced by the monthly time sheets Voxtel produced (*id.* at 42-44; app. sur-reply br. at 14-15).[19]

The primary purpose of FAR 31.201-5 is to provide the government with a refund when a cost that has been reimbursed to a contractor is later reduced. *Hercules*

---

[19] Again, DCMA chose not to respond to appellant's counter-arguments on the credits issue. We could consider DCMA's arguments concerning deductibility and credits, to be waived. *See Golden IT, LLC v. United States*, 157 Fed. Cl. 680, 695 (Fed. Cl. 2022) ("This Court will not permit a party to raise a phalanx of thin arguments . . . thereby forcing the opposing party to spend time and briefing space to engage with all of them — only to abandon them in the face of the counterarguments, and yet insist that the Court adjudicate the entire initial salvo.").

*Inc. v. U.S.*, 292 F.3d 1378, 1382 (Fed. Cir. 2002). The government should receive the benefit of that reduction. While not intended to be all-encompassing, examples of the types of "income, rebate, allowance, or other credit" covered by FAR 31.201-5 are taxes, debt concessions, correction of an overpayment, recovery of allowable site restoration costs, and recoveries from insurers or other third parties. That is not the case here, where the costs at issue consist of compensation for Mr. Williams' services that were sufficiently supported [20] (findings 108, 110-11, 115). Under this set of facts, the government has not adequately established that the compensation included in the K-1 distribution was subsequently excused or refunded back to the corporation.

Accordingly, we find that DCMA has failed to meet its burden of proof with respect to the unallowability of the executive compensation costs represented by the unpaid owner's salary. We therefore hold that those costs are allowable in the following total amounts:

| | |
|---|---|
| FY 2007 | $194,064.10 |
| FY 2008 | 21,933.41 |
| FY 2009 | 149,995.86[21] |
| | $365,993.37 |

(Finding 106; *see* gov't br. at 42; app. br. at 50)

---

[20] We note that Voxtel's expert testified that the credits provision should not apply in these circumstances because the unpaid owner's salary was actually paid to Mr. Williams, and there was no income generated from those payments (finding 117).

[21] We note that in briefing this issue, the dollar figure DCMA identifies as unallowable compensation costs for FY 2009 is $149,995.86 (gov't br. at 42). Although Voxtel notes that the source of this figure is "unclear" (app. br. at 28 n.6), this is the figure that Voxtel requests the Board find allowable for FY 2009 (app. br. at 50).

CONCLUSION

We sustain the appeal with respect to the allowability of $267,209.97 in IR&D costs and $365,993.37 in executive compensation costs for FY 2007-2009. We deny the appeal with respect to the allowability of $44,960 in rental costs for FY 2009.

We return this matter to the parties to recalculate the rates in accordance with this decision.

Dated: March 9, 2023

STEPHANIE CATES-HARMAN
Administrative Judge
Armed Services Board
of Contract Appeals

I concur

RICHARD SHACKLEFORD
Administrative Judge
Acting Chairman
Armed Services Board
of Contract Appeals

I concur

J. REID PROUTY
Administrative Judge
Vice Chairman
Armed Services Board
of Contract Appeals

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA No. 60129, Appeal of Voxtel, Inc., rendered in conformance with the Board's Charter.

Dated: March 16, 2023

PAULLA K. GATES-LEWIS
Recorder, Armed Services
Board of Contract Appeals